677 So.2d 1027 (1996)
Julius John EGAN
v.
KAISER ALUMINUM & CHEMICAL CORPORATION, et al.
No. 94-CA-1939.
Court of Appeal of Louisiana, Fourth Circuit.
May 22, 1996.
Rehearing Denied August 29, 1996.
*1030 Robert H. Urann, Robein, Urann & Lurye Metairie, and Daniel L. Dysart, Dysart, Sanborn & Tabary, Chalmette, for Plaintiff/Appellee.
Michael T. Cali, James H. Brown, Jr., John J. Hainkel, III, Greg A. Pellegrini, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, for Defendant/Appellant.
Before SCHOTT, C.J., and ARMSTRONG and PLOTKIN, JJ.
ARMSTRONG Judge.
This is an appeal by one of the defendants, Owen-Corning Fiberglass Corporation ("OCF"), in a negligence and products liability personal injury case. The plaintiff, Julius John Egan, alleges that he had contracted mesothelioma, a fatal cancer of the lining of the lung, as a result of his exposure to asbestos-containing products manufactured or distributed by OCF at his workplace. Following a bench trial, the trial court found OCF liable for plaintiff's damages. As we find no manifest error or abuse of discretion, we affirm.
Plaintiff originally sued his former employer, Kaiser Aluminum & Chemical Corporation ("Kaiser") and numerous manufacturers and suppliers of asbestos-containing products, including OCF seeking damages for his contraction of mesothelioma. He later added several other defendants. The named defendants fell into three broad categories, being the manufacturers and suppliers of asbestos-containing products, plaintiff's former employers, and executive officers of those employing companies, as well as insurers of some defendants. Trial commenced with only OCF, AC & S, Inc. ("AC & S"), Eagle, Inc. ("Eagle") and Rock Wool Manufacturing Company ("Rock Wool"), all other defendants having been dismissed by the court on motion or as a result of settling with the plaintiff. Following the close of the plaintiff's case the trial court granted motions for involuntary dismissals urged by AC & S, Eagle and Rock Wool. The trial court found that exposure to asbestos-containing products manufactured by OCF caused plaintiff's illness and rendered judgment against OCF. The court found that four of the settling defendants, former employers Todd Shipyards, Inc. and Kaiser, and manufacturers Armstrong World Industries ("Armstrong") and Owens-Illinois, were also liable for the *1031 plaintiff's damages and reduced the award to plaintiff from $361,851.40 to $72,370.28 to reflect a set-off for their virile shares. OCF's motion for new trial was denied and this appeal followed. Plaintiff answered the appeal, seeking punitive damages. Subsequent to the rendition of judgment, pending appeal, the plaintiff, Julius J. Egan, died of mesothelioma. His wife and children were substituted as plaintiffs.
The record reflects that over his lifetime, plaintiff worked at a number of industrial businesses where he was, more probably than not, exposed to asbestos-containing insulation materials. He worked for Todd Shipyards from 1939-1944, and from 1946-1952, where he spent approximately 90% of his time as a welder repairing boilers. From 1952-1961 he worked out of a local union at various jobs, including a construction job at a Kaiser plant being built in Gramercy, Louisiana. In 1961 plaintiff began working for Kaiser at its plant in Chalmette, Louisiana ("Kaiser-Chalmette"), where he worked as a welder until his retirement in 1978.
In late 1992 the plaintiff began to experience problems breathing, becoming winded while walking. He had never smoked cigarettes. He was examined By Dr. Brad Burns, an internist and pulmonologist, at Ochsner Hospital and Clinic, in January 1993. Dr. Burns diagnosed the plaintiff as suffering from a mesothelioma, a primary tumor of the pleura, or lining of the lung cavity, as opposed to an adenocarcinoma, or tumor which had metastasized from some other primary cancer site. Dr. Michael McFadden, a cardiovascular surgeon and director of the lung transplant program at Ochsner, performed a thorascopic pleura and lung biopsy of the plaintiff on February 2, 1993. He said the appearance of the plaintiff's lungs was consistent with a mesothelioma, but that he could not rule out an adenocarcinoma that had metastasized to the pleura. Dr. McFadden did not make a diagnosis, but merely provided tissue for the pathologist. Dr. Terrence Casey, a pathologist at Ochsner, testified that the tissue he examined from the plaintiff was malignant, either mesothelioma or adenocarcinoma, but that tests indicated a mesothelioma. Dr. Casey said if you showed the plaintiff's case to 100 pathologists, 95 of them would say it was mesothelioma, the other 5, not mesothelioma; the probability that it was a mesothelioma was 95%. Dr. Casey further stated that all six pathologists at Ochsner agreed that the plaintiff's cancer was a mesothelioma. Dr. Casey found no asbestos foreign bodies and was not in a position to say it was an asbestos-related mesothelioma.
Dr. Alan D. Glick, a pathologist with Vanderbilt University Medical Center in Nashville, Tennessee, examined a tissue sample from the plaintiff's pleural cavity which had been sent to him by Dr. Casey. Dr. Glick's subspecialty was tissue analysis using an electron microscope to magnify the tissue sample up to fifty thousand times. In particular, for fifteen years Dr. Glick had used electron microscopy to differentiate between mesotheliomas and adenocarcinomas. Dr. Glick determined that the cancer present in the tissue sample from the plaintiff was a mesothelioma.
Dr. Gerald Liuzza, an anatomic pathologist, testified that he observed an asbestos body in one slide of the tissue removed from the plaintiff. Dr. Liuzza said that the discovery of one asbestos body heightens the suspicion that there may be more. He explained that while a normal person is going to have an occasional asbestos body in his body here or there, you'd have to examine 100 sections of lung tissue before finding one. Finding an asbestos body in a single section of lung tissue suggested to Dr. Liuzza that the plaintiff had an increased asbestos exposure and resultant heavy asbestos fiber burden in his lungs. He said, in his opinion, the plaintiff had diffuse malignant mesothelioma that was related to heavy asbestos exposure and increased pulmonary asbestos fiber burden. He could not say which exposure to asbestos during his work career caused the mesothelioma, but testified that each exposure had some causal relationship. Dr. Liuzza said he did not specifically diagnose him with asbestosis.
The plaintiff worked at Todd Shipyards for thirteen years, where the majority of his time was spent repairing boilers on ships. But, he worked next to asbestos workers *1032 insulators. He was never given any respiratory protection at Todd. He saw asbestos in boxes but never saw any warnings on any of the boxes. After leaving Todd he worked out a local union for eight or more years. During this period he worked at the Kaiser plant in Gramercy, Louisiana, for approximately one year, during 1958 and 1959. During some of this time at Kaiser-Gramercy he worked around insulators, but not all the time. He began working for Kaiser at its Chalmette plant in 1961. He worked in a building housing the carpenter "shop" where the carpenters used to cut insulation material, marinite board, which, at that time, he did not know contained asbestos. The carpenter shop was covered with dust from the cutting of the marinite board. He said he only worked in the carpenter shop 30-50% of the time, but also walked through there to get to the lunch room and the bathroom. Most of his time was spent working on furnaces. The plaintiff did not know who manufactured any of the insulation materials he worked around. He said it wasn't until the mid-1970's that Kaiser began providing them with respiratory protection. The plaintiff retired in 1978 due to a back problem.
Hubert Bradley worked at Todd Shipyards from 1936-1938 and 1942, 1943-1956, working approximately eight years at Todd while the plaintiff was there. Eighty-five percent of Bradley's work was re-insulating boilers. He testified by deposition that he used Kaylo at Todd; he remembered seeing the name on boxes of the block insulation. He did not remember the name "Owens-Illinois" on the boxes. He said Kaylo was maybe 25% of the insulation he worked with. He also said: "As long as I was at Todd, every once in a while, I used Kaylo."
James Poche testified that he worked at the Kaiser-Gramercy plant from 1958-1961 as a general superintendent. He testified that, referring to a specification manual, they used Kaylo block insulation manufactured by Owens-Illinois, and Kaytherm, manufactured by Keasbey & Mattison Co. He identified photographs at the site of the plant which showed Kaylo and Kaytherm insulation packages. One photograph was dated January 1959. He said 25-30% of the work done was with Kaytherm insulation material and, at that point, they stopped using Kaytherm and began using Kaylo.
Frank M. Parker III, an engineer and industrial hygienist by occupation, testified regarding the properties of asbestos. Parker said that, doing the kind of work described by the plaintiff, there was no question but that asbestos fibers were "liberated" in the areas in which he worked and that the plaintiff would have inhaled those fibers. He said it was more likely than not that from time to time, the plaintiff was exposed to asbestos fiber dust in excess of contemporary health and safety standards. He had reviewed air samples from Kaiser-Chalmette. He said the post-1972 exposure in the marinite shop would have been in excess of contemporary standards about 50% of the time, meaning that the ventilator system at Kaiser-Chalmette was not effective. Mr. Parker believed that all asbestos-containing products are unreasonably dangerous because in their life cycle they emit fibers. He said it was known in the late 1930's that anyone exposed to asbestos fibers was at risk and that information would have been available as an exposure standard to all of the plaintiff's employers as early as then. He also referred to a 1943 U.S. Maritime Commission safety report adopted from a U.S. Navy report that listed asbestos work as a job requiring protective equipment.
Jerry Hesler, an employee of Owens-Corning Fiberglass Corporation, testified that Owens-Corning purchased a Kaylo facility from Owens-Illinois in 1956 and in late 1958 started manufacturing Kaylo at that plant. He said Owens-Illinois is completely separate from Owens-Corning.
The deposition of Marvin Scheunemann was entered into evidence. Scheunemann worked at Kaiser's Chalmette plant as a safety supervisor from 1956-1971. He said he never observed the use of any asbestos-containing products at the Kaiser-Chalmette plant and did not know whether Kaiser ever purchased any asbestos-containing products. He never recalled asbestos being a topic of any safety reports and never saw any pamphlets or instructions from Kaiser headquarters on how to handle asbestos. He said the *1033 plant had an extensive dust-control system in the plant. He could not recall whether any dust level testings were done at Kaiser-Chalmette. He said respirators were available for use at the plant but were not required.
The deposition of George Probst was introduced into evidence. Probst worked at Kaiser-Chalmette from 1951-1958 and Kaiser-Gramercy from 1958-1982. He said the product used to insulate the steam lines was Kaylo. It was in blocks and in rounded sections also. He said the cutting of the marinite board was a dusty process and that there was no dividing area where the marinite work was done.
The deposition of Edward C. Ames was entered into evidence. Ames said it was known to Owens-Corning that workers in plants handling, manufacturing or fabricating asbestos materials were at risk.
The 1981 deposition of Robert Peele, an industrial hygienist employed by Union Carbide, was introduced in evidence. Peele said that in 1961, after receiving complaints from a Union Carbide safety engineer about working conditions of workers cutting Kaylo block insulation with a band saw, he "counted" the Kaylo dust generated by the sawing operation. Peele testified that in 1961 there was "threshold limit value" for asbestos which, generally speaking, was a limit a worker would be exposed to without incurring any adverse effects. He concluded that Kaylo block insulation could be safely fabricated or sawed when "using the original downdraft exhaust ventilation if existing leaks, observed on the # 1 band saw, are corrected" and that "Kaylo insulation blocks definitely may be safely fabricated when using the entire exhaust ventilation facilities now available, that is, hoods above the blocks as well as below." There was no testimony that this was the type of ventilation system at either of the Kaiser plants.
On appeal OCF raises four assignments of error.

EXPOSURE TO ASBESTOS
OCF first claims the trial court was manifestly erroneous in finding that the plaintiff had been exposed to Kaylo pipe insulation because (1) the plaintiff did not know the identity of the manufacturer of the insulation he was exposed to and (2) to the extent evidence showed he had been exposed to Kaylo, it showed he was exposed to Kaylo manufactured by Owens-Illinois, not OCF, a separate company.
The trial court's finding that the defendant was exposed to an OCF product is a finding of fact which may not be disturbed by this court unless the finding is clearly wrong-manifestly erroneous or is without evidentiary support. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099 (La. 9/5/94), 639 So.2d 216, 221; Young v. Logue, 94-0585 (La.App. 4th Cir. 5/16/95) 660 So.2d 32, 41, writ denied, 95-2575, 95-2585, 95-2597 (La. 12/15/95), 664 So.2d 443, 444.
As to exposure, the plaintiff had the burden of proving it was more probable than not that he had been exposed to OCF asbestos-containing products in such a way that he would have ingested the asbestos fibers. There is a dearth of Louisiana jurisprudence in the area of proof of exposure to asbestos. Looking to the federal courts for guidance, in Martin v. American Petrofina, Inc, 779 F.2d 250 (5th Cir.1985), modified on other grounds, 785 F.2d 543 (5th Cir.1986), the plaintiff allegedly exposed to asbestos-containing products manufactured by the Benjamin Foster company had been a pipe fitter at Exxon in 1951 and from 1956-1961. The plaintiff, as in the instant case, did not recall whether he worked with the particular asbestos-containing product. However, a witness who did contract work for various companies, including Exxon, testified that he used Benjamin Foster asbestos-containing mastics more than any other product. The U.S. Fifth Circuit, applying the federal standard for sufficiency of evidence to rule on a motion for judgment notwithstanding the verdict, found that there was "sufficient evidence for a finder of fact to conclude that, more probably than not, the plaintiff was exposed to [Benjamin Foster] mastics."
The evidence supports a finding that, more probably than not, Kaylo was used at the Kaiser-Gramercy plant during the period *1034 the plaintiff worked there. The plaintiff worked around insulators at the Gramercy plant. In the instant case, as in Martin, supra, the plaintiff could not recall the name or names of the manufacturer(s) of the insulation products he worked around at the Gramercy plant. All he could recall was that the insulation was packaged in boxes. James Poche testified at trial that Kaylo was used at Kaiser-Gramercy during 1959, when the plaintiff worked there. In a deposition he had said the use of Kaylo in 1959 was "iffy." However, a photograph introduced in evidence and identified by him shows a section of the Gramercy plant with a least one box on the ground, in the distance, marked "KAYLO." There are several other similar boxes turned on their sides in the photograph and it appears that insulation work is in progress. The photograph is dated January 1959. Other photographs, undated, show insulation work underway at the plant. Frank Parker testified that in a work place environment the plaintiff would have inhaled insulation fibers, asbestos fibers. Overall, the evidence supports a finding that the plaintiff was exposed to Kaylo during 1959. Such a finding cannot be considered clearly wrong.
OCF next argues that, even assuming the plaintiff proved he had been exposed to Kaylo, he failed to establish that the particular Kaylo was manufactured by it. Prior to April 30, 1958, OCF did not manufacture Kaylo. OCF admits that prior to that date it distributed Kaylo. On that date OCF acquired ownership of the Kaylo trademark, inventories of raw materials for the manufacture of Kaylo, materials in the process of being manufactured into Kaylo, and all finished Kaylo products in the Owens-Illinois warehouse. Jerry Helser, an OCF employee, testified that OCF began manufacturing Kaylo the following month, May 1958, in other words, immediately following the April 30, 1958 sale. One undated photograph introduced into evidence shows a fairly close-up shot of what appears to be a box marked Kaylo, though only the "K" is visible. That box has Owens-Illinois printed on it.
The question is whether the evidence is sufficient to support a finding or inference that the Kaylo the plaintiff was exposed to in 1959 was manufactured by OCF. There was no evidence as to when the Kaylo used at the Gramercy plant was manufactured or distributed. However, we do know that OCF acquired the rights to Kaylo on April 30, 1958. This was at least six months before the only dated photograph, dated January 1959, which showed boxes of Kaylo at the plant site. We note that the photograph of the Kaylo box with Owens-Illinois printed on it appears to be different from the Kaylo box depicted in the January 1959 photograph. The "KAYLO" lettering is printed higher on the package in the January 1959 photograph than it is in the other undated photograph of the Owens-Illinois box, although the packages appear to be similarly shaped. Presumably, when Owens-Illinois ceased manufacture of Kaylo as of April 30, 1958, and OCF began manufacturing it under its name in May 1958, the packaging was changed to reflect that the manufacturer was OCF, not Owens-Illinois. We find this apparent difference in the packaging, together with the established fact that OCF began manufacturing Kaylo in May 1958, sufficient to support an inference that, more probably than not, the Kaylo depicted in the January 1959 photograph was manufactured by OCF and, the plaintiff, who worked at the plant in 1959, was exposed to Kaylo manufactured by OCF. OCF offered nothing to rebut this inference.

CAUSATION
OCF next argues that the trial court erred in finding a sufficient causal connection between the plaintiff's exposure to its asbestos-containing insulation and his mesothelioma. OCF submits that the brief period of exposure, possibly one year, when measured against his long-term exposure to other asbestos-containing products during his working career, was not a cause in fact of his disease.
The trial court's finding of causation is a finding of fact which may not be disturbed unless the record does not furnish a basis for the finding and it is clearly wrong. Ambrose, supra. This court has previously applied the "substantial factor" test to determine whether exposure to a particular asbestos-containing *1035 product was a cause-in-fact of a plaintiff's asbestosis. Quick v. Murphy Oil Co., 93-2267 (La.App. 4th Cir. 9/20/94), 643 So.2d 1291, writ denied, 94-2583 (La. 1/6/95), 648 So.2d 923. That is, the exposure has to be a substantial contributing factor to the plaintiff's disease.
In Quick, this court found that the plaintiff's exposure to a particular asbestos-containing product had not been a "substantial contributing factor" in his development of asbestosis. OCF cites Quick and the substantial contributing factor analysis and submits that the result in the instant case should be the same. That is, Mr. Egan's exposure to Kaylo at the Kaiser-Gramercy plant for a period of one year was not a substantial contributing factor in the development of his mesothelioma, when compared to his exposure to other asbestos-containing products over the span of his career as a welder working around insulators.
In the instant case, the disease we are concerned with is mesothelioma, which, the evidence showed, can develop from relatively short high-intensity exposure to asbestos, as opposed to the asbestosis in Murphy, which develops as a result of relatively high exposure levels over a fairly long period of time. Dr. Gerald Liuzza testified that he could not say which exposure to asbestos during the plaintiff's lifetime caused his mesothelioma, but that it was his opinion they all had something to do with it. In Murphy, a physician testified that the plaintiff likely would have developed asbestosis even if he had not been exposed to the particular asbestos-containing product. There was no such evidence presented in the instant case.
Simply because the plaintiff was exposed to OCF's asbestos-containing product over a relatively short period of time, and had considerable long-term exposure to other products, it cannot be said that the exposure to Kaylo could not have been a substantial contributing factor in his development of mesothelioma. The evidence supports a finding that his exposure to Kaylo was a substantial contributing factor in his development of the disease. We are unable to say that such a finding is clearly wrong.

QUANTUM
OCF claims the trial court abused its discretion in awarding plaintiff general damages totalling $350,00.00.
Before an appellate court can disturb a trial court's award of general damages, the record must clearly reveal that the trier of fact abused its discretion in making the award. Only after finding that the record shows the trial court abused its discretion can the appellate court disturb the award, and then only to the extent of raising or lowering it to the highest or lowest point which would have been within the discretion afforded the trial court. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); Burton v. Berthelot, 567 So.2d 649 (La.App. 4th Cir.1990), writ denied, 569 So.2d 989 (La.1990). Before an appellate court questions a trial court award as inadequate or excessive, it must look not to prior awards, but to the individual circumstances of the instant case. Reck v. Stevens, supra; Burton v. Berthelot, supra.
The plaintiff testified that he had been experiencing increasing shortness of breath, chest pain and weakness since his diagnosis. He said his side always hurts. He said he is very much concerned about his mortality and said he has to straighten out things financially for his family and get his life "straightened out religiously." OCF submits that, considering the lack of significant evidence as to his pain, suffering and mental anguish, considered along with the plaintiff's age at the time of trial, 74 years, the award was an abuse of discretion.
The plaintiff contracted a fatal disease from OCF's product. He died soon after judgment was rendered in the trial court. Even assuming the award was on the high side, we are unable to say that the award of $350,000.00 in general damages was an abuse of discretion.

SET-OFF
OCF's final assignment of error is that the trial court erred in failing to reduce the judgment against it to reflect a "set-off" for *1036 the virile shares of parties it claims were liable in solido for plaintiff's damages but with whom the plaintiff settled prior to trial.
The trial court found that the plaintiff had carried his burden of proving fault on the part of Todd Shipyards, Kaiser, Armstrong World Industries and Owens-Illinois, and reduced the total award to the plaintiff from $361,851.40 to $72,370.28 accordingly, to reflect a set-off for the fault attributed to those four parties. OCF claims the trial court also should have reduced the total award of damages by the virile share attributable to the negligence of particular Kaiser executive officers, and by the virile shares attributable to asbestos products manufacturers Pabco, Foster-Wheeler and Babcock & Wilcox.
Assuming fault on the part of the executive officers and Pabco, Foster-Wheeler and Babcock & Wilcox, the total award of damages would be reduced by those parties virile shares, as the trial court correctly did with regard to the fault of Todd, Kaiser, Armstrong World Industries and Owens-Illinois. See Cole v. Celotex Corp., 599 So.2d 1058 (La.1992).
In its brief on appeal, OCF claims it proved the negligence of Kaiser executive officers. However, its brief only refers to three co-employees, Albert Trommerhausen, Kaiser's chief industrial hygienist from 1960-1971, Marvin Scheunemann, a safety supervisor at Kaiser-Chalmette from 1960-1966, and William Crates, who succeeded Scheunemann. Albert Trommerhausen was never named as a defendant by the plaintiff. OCF offers no specific argument as to the liability of any of the executive officers or co-employees it alleges were negligent.
In Canter v. Koehring Company, 283 So.2d 716 (La.1973), the Louisiana Supreme Court set out the following criteria necessary to impose individual liability on an executive officer or co-employee:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
(Footnotes omitted).
The record contains no specific evidence concerning the duties or conduct of three of the parties OCF claims were at fault: Ted Aucoin, William Crates and McHaney. As to Marvin Scheunemann, a safety supervisor at Kaiser-Chalmette from 1960-1966, his deposition testimony does not establish fault on his part under Canter, 283 So.2d 716. Crates succeeded Scheunemann but there is no specific evidence as to his duties or conduct. We find the evidence insufficient to support a finding of fault on the part of these executives/co-employees.
As to fault on the part of manufacturers Pabco (Fibreboard), Foster-Wheeler and *1037 Babcock & Wilcox, again, the evidence does not establish that it was more probable than not that asbestos-containing products from these manufacturers were a substantial contributing factor in the plaintiff's contracting of mesothelioma.

PUNITIVE DAMAGES
The plaintiff answered OCF's appeal, claiming the trial court erred in failing to award punitive damages. Plaintiff claims this court should apply Ohio law and award punitive damages, which are unavailable under Louisiana law in a case such as the instant one. The applicable law regarding choice of law was set forth by this court in another case involving a plaintiff seeking punitive damages, Pittman v. Kaiser Aluminum and Chemical Corp., 559 So.2d 879 (La.App. 4th Cir.1990), writ denied, 563 So.2d 885 (La.1990), as follows:
It is well settled that the choice of law rule applicable in tort in Louisiana is a form of "interest analysis" applying the "most significant relationship" approach of the Restatement (Second) of Conflicts of Laws (1969). Jagers v. Royal Indemnity Company, 276 So.2d 309 (La.1973); Lee v. Ford Motor Co., 457 So.2d 193 (La.App. 2nd Cir.1984), writ denied 461 So.2d 319 (La.1984). Interest analysis is a two step process. First, it must be determined whether a true or false conflict exists. If a false conflict exists, the law of the state that has the exclusive interest is applied and the second step is unnecessary. If a true conflict exists, however, the second step is to apply the law of the state with the most significant contacts. Lee v. Ford Motor Company, supra.

* * * * * *
[If] a true conflict exists, the second step is to determine which state has the most significant relationship to the issue. In so doing we note that Section 6 of the Restatement of Conflict of Laws provides several factors to be considered where a state has no statutory directive on the choice of law. Those factors are:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified exceptions,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity or [sic] result, and
(g) ease in the determination and application of the law to be applied."
Specifically referring to tort issues ... section 145 provide[s]:
* * * * * *
Section 145. The General Principle.
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Section 6. (emphasis added)
(2) Contacts to be taken into account in applying the principles of Section 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.
In the instant case, a true conflict exists between Louisiana law and Ohio law. Louisiana law does not provide for punitive damages under these circumstances while Ohio law ostensibly does.
Plaintiff submits that the above factors favor applying Ohio law. We disagree and find that the factors favor applying Louisiana law. Louisiana law prohibits the award of exemplary or punitive damages unless expressly authorized by statute. International *1038 Harvester Credit Corporation v. Seale, 518 So.2d 1039 (La.1988). In Pittman, 559 So.2d 879, this court made a policy statement regarding the application of Louisiana law versus allowing punitive damage awards under the laws of other states. We stated: "Louisiana's interest lies in the protection of its judicial system, rather than domestic defendants, from what it might consider inherently speculative awards" 559 So.2d at 883.
That relevant policy of this state is an important consideration in our decision not to apply Ohio law. While the plaintiff argues that predictability or uniformity of result presents the strongest case for applying Ohio law, we believe the opposite is truethe application of Louisiana law to asbestos-related suits filed in Louisiana by Louisiana residents, where the exposure to the asbestos-containing products occurred in Louisiana, will result in predictability and uniformity of result in those cases. There is nothing unjust in saying that a Louisiana resident seeking recourse in a Louisiana state court for an injury occurring in Louisiana must proceed under Louisiana law. We find no merit to plaintiff's argument otherwise.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
SCHOTT, C.J., dissenting in part.
SCHOTT, Chief Judge, dissenting in part:
Plaintiff worked for Todd Shipyards for eleven years during which he was exposed to asbestos containing products manufactured by Foster-Wheeler Corporation, Babcock & Wilcox Company and Pabco (formerly Fibreboard). Appellant contends it is entitled to a reduction in the liability for the virile shares owed by these other manufacturers. In the majority opinion my colleagues conclude that the evidence was sufficient to prove that appellant's product caused plaintiff's mesothelioma based on the testimony by Dr. Gerald Liuzza. Yet they acknowledge that Dr. Liuzza could not say which exposure during plaintiff's lifetime caused his problem, but they all had something to do with it. This testimony establishes causation not only on the part of appellant, but also on the part of the other identified manufacturers. Consequently, the denial of the set off due to the fault of these other manufacturers when causation is no more likely by one product than the others is a clear contradiction.
In order to be consistent in recognizing Dr. Liuzza's opinion as to causation, i.e., that all asbestos products to which plaintiff was exposed, not just appellant's, had something to do with his condition, we should reduce the judgment against appellant by the shares of fault attributable to the other three manufacturers of these products.