933 So.2d 843 (2006)
Joseph A. THOMAS
v.
A.P. GREEN INDUSTRIES, INC., et al.
No. 2005-CA-1064.
Court of Appeal of Louisiana, Fourth Circuit.
May 31, 2006.
*847 S. Ann Saucer, Renee M. Melancon, Baron & Budd, P.C., Dallas, TX, J. Burton LeBlanc, Cameron R. Waddell, Jody E. Anderman, LeBlanc & Waddell, LLC, Baton Rouge, LA, for Plaintiffs/Appellees.
Susan B. Kohn, Douglas Kinler, Michael Harold, Simon, Peragine, Smith & Redfearn, L.L.P., New Orleans, LA, for Defendant/Appellee, The McCarty Corporation.
Kenneth P. Carter, Cory R. Cahn, W. Scott Brown, Entergy Services, Inc., New Orleans, LA, for Defendant/Appellant, Entergy Louisiana, Inc.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR., Judge EDWIN A. LOMBARD).
PATRICIA RIVET MURRAY, Judge.
This is an asbestos exposure premises liability case. The plaintiffs are the surviving spouse and adult children of Namon Joshua, Jr., who died of lung cancer. Alleging that Mr. Joshua's lung cancer was caused by his occupational exposure to asbestos while working as a carpenter, the plaintiffs sued, among others, the owners *848 of the various work sites at which Mr. Joshua was employed. The sole premises-owner defendant remaining at the time of trial was Entergy Louisiana, Inc. ("ELI"), formerly known as Louisiana Power & Light Company ("LP & L"). ELI was sued in its capacity as owner of Waterford Steam Electric Station  Units 1, 2, and 3 located in Taft, Louisiana ("Waterford 1 & 2" and "Waterford 3").[1] The plaintiffs allege that Mr. Joshua's death was caused by his "bystander" exposure to asbestos while working during the initial construction of Waterford 1 & 2 and Waterford 3.[2] From a judgment in favor of the plaintiffs, ELI appeals. For the reasons that follow, we amend the judgment to reduce the wrongful death damages awarded to Mr. Joshua's surviving spouse, but otherwise affirm.

FACTUAL BACKGROUND
On June 18, 2001, Mr. Joshua, a seventy-six year old retired carpenter, died of lung cancer. During his forty-one year work life, which spanned from 1946 to 1987, Mr. Joshua worked for various employers at various industrial sites, including Monsanto Chemical Company ("Monsanto"), Union Carbide, and ELI's Waterford 1 & 2 and Waterford 3. Although it is alleged that Mr. Joshua was exposed to asbestos at all the various industrial sites where he worked, the focus in this case is on Mr. Joshua's exposure while working at ELI's Waterford facilities.
Mr. Joshua worked at the Waterford facilities only during the initial construction of those facilities. Waterford 1 & 2 was constructed between 1971 and 1975. Waterford 3 was constructed between 1977 and 1986.
In 1971, ELI signed a contract with Ebasco Services, Inc. ("Ebasco") for it to design, engineer, and construct Waterford 1 & 2, mirror image power generation facilities. In 1972, ELI signed a similar contract with Ebasco for the construction of Waterford 3, a nuclear power facility; however, the construction of Waterford 3 did not actually commence until about 1975.
Mr. Joshua never worked directly for ELI; rather, he worked for three other companies involved in the construction of the Waterford facilities. From 1974 to 1975, Mr. Joshua worked at Waterford 1 & 2 for an insulation contractor, The McCarty Corporation ("McCarty"). From 1977 to 1980, he worked at Waterford 3 for an independent contractor, J.A. Jones. From 1981 to 1985, he again worked at Waterford 3 for the general contractor, Ebasco.
It is undisputed that Mr. Joshua smoked for over twenty years and that he quit smoking in the 1980s. In 1987, Mr. Joshua retired. In January 2001, Mr. Joshua was diagnosed with lung cancer and asbestos-related pleural plaques. Whether Mr. Joshua also had asbestosis is disputed. One of the medical experts, Dr. Glenn Gomes, who is a "B reader," opined that Mr. Joshua had asbestosis.[3] None of *849 the other medical experts diagnosed him with asbestosis. Although, at trial, ELI disputed medical causation and argued that a finding of asbestosis is required to link lung cancer to asbestos exposure, on appeal, it does not contest the jury's finding that Mr. Joshua's lung cancer was caused by asbestos exposure. On June 18, 2001, Mr. Joshua died of lung cancer.

PROCEDURAL BACKGROUND
In March 2001, Joseph Thomas commenced the instant suit against several manufacturers and premises owners, not including ELI, alleging that "[d]uring various lengthy periods of time, Plaintiff suffered occupational exposure to asbestos and asbestos-containing products designed, mined, manufactured, sold, distributed, supplied and/or maintained on various premises by the defendants." In June 2001, Mr. Thomas's counsel filed a First Supplemental and Amended Petition to add Mr. Joshua as a plaintiff and ELI as a defendant.[4] Following Mr. Thomas's death, Mr. Joshua's surviving spouse and five adult children amended the suit to assert survival and wrongful death claims.
Before trial, all but three of the named defendants either settled or were dismissed. The remaining three defendants who participated in the trial were ELI, McCarty, and Eagle, Inc. At the eleven-day jury trial in this matter, twenty-two witnesses testified and a plethora of documents were introduced. The witnesses who testified included:
 Mr. Joshua's surviving spouse (Beatrice Joshua) and five adult children (Namon Joshua, III, Mary Lou Davis, Farrell Joshua, Joyce Madison, and Gerald Joshua);
 Five of Mr. Joshua's co-workers  three who worked at Waterford 1 & 2 (Oscar Lewis, Ellis Bourque, Jr., and Steven Williams) and two who worked at Waterford 3 (Burton Cosse and Israel Landry);
 Two of ELI's corporate representatives  one for Waterford 1 & 2 (Gustave VonBodungen) and one for Waterford 3 (John Houghtaling);
 One of McCarty's former owners (Harold Thomas Branton);
 Ebasco's construction manager (James Brooks);
 Several asbestos experts, including two industrial hygienists  one for the plaintiffs (Vernon Rose, Ph. D.) and one for ELI (Francis Weir, Ph. D)  and one cellular biology expert specializing in the field of the mechanism of asbestos disease (Arnold Brody, Ph. D.);[5] and
 Several of Mr. Joshua's doctors, including Dr. Gomes.
At the close of the plaintiffs' case, the trial court granted Eagle's motion for directed verdict.[6] At the close of all the evidence, the trial court granted McCarty's motion for directed verdict. Thus, the only defendant remaining at the time the case was submitted to the jury was ELI. The jury rendered a verdict in favor of the plaintiffs, answering the special interrogatories as follows:
 Mr. Joshua was exposed to asbestos-containing material.
 Mr. Joshua's asbestos exposure was a substantial contributing factor to the development of his lung cancer, which caused his death, but it was not a substantial contributing factor to his development of asbestosis.

*850  Mr. Joshua was exposed to asbestos-containing material while working at ELI's Waterford 1 & 2 and Waterford 3, and such exposure was a substantial factor in the development of his disease.
 ELI was negligent, but not strictly liable, regarding Mr. Joshua's asbestos exposure at Waterford 1 & 2, and Waterford 3.
 Ebasco was negligent, and its negligence was a substantial factor in the development of Mr. Joshua's disease.
 As to the three identified manufacturers of asbestos-containing products  Garlock, Inc., Flexitallic, and John Manville  Mr. Joshua was not exposed to asbestos-containing products manufactured by any of them and/or such exposure was not a substantial contributing factor to the development of his asbestos-related disease.
 Mr. Joshua was exposed to asbestos-containing material while working at the premises of Monsanto Chemical Company and Union Carbide and such exposure was a substantial factor in the development of the disease. These two premises owners were negligent, but not strictly liable.
The jury allocated fault among the parties responsible for Mr. Joshua's damages as follows:

 ELI (Waterford 1 & 2) 30%
 ELI (Waterford 3) 30%
 Ebasco 20%
 Peter Kiewitt None
 Garlock, Inc. None
 Flexitallic None
 Johns-Manville None
 Monsanto 10%
 Union Carbide 10%
 ____
 TOTAL 100%

The jury awarded $2 million in survival damages and awarded wrongful death damages as follows: $2.75 million to Beatrice Joshua (surviving spouse), $200,000 to Mary Lou Davis, and $250,000 each to Namon Joshua, III, Farrell Joshua, Joyce Madison, and Gerald Joshua.[7] On September 21, 2004, the trial court rendered judgment against ELI in accordance with the jury's answers to the interrogatives. As to the survival action, the court cast ELI for its virile share, $666,666.66. As to the wrongful death actions, the court cast ELI with 60% of the plaintiffs' wrongful death awards. This appeal followed.[8]

DISCUSSION
On appeal, ELI asserts the following seven assignments of error:
1. ELI did not breach any duty it may have owed to Namon Joshua in connection with his work for an independent contractor, McCarty, during the original construction of Waterford Steam Electric Station  Units 1 and 2.
2. The court below erred in granting McCarty's motion for directed verdict.
3. Plaintiffs did not carry their burden of proving by a preponderance of the evidence that Namon Joshua was exposed to asbestos at Waterford 3 or, to the extent that Mr. Joshua was exposed to asbestos, that ELI was negligent.
4. The court below abused its discretion and irreparably damaged ELI's *851 defense by striking John Houghtaling's August 31, 2004, testimony.
5. The court below abused its discretion when it allowed plaintiffs to introduce into evidence the unrelated root cause analysis report drafted in 2002.
6. The jury was manifestly erroneous and clearly wrong in not finding Johns Manville liable for plaintiffs' damages.
7. The jury erred in awarding excessive damages to Beatrice Joshua for her wrongful death claim.
For the following reasons, we find that only the last assignment of error is persuasive.

1. ELI's liability for Waterford 1 & 2  Independent Contractor Defense
ELI contends that to the extent Mr. Joshua was exposed to asbestos fibers while working at Waterford 1 & 2, which it denies, the sole responsibility for this exposure rests with McCarty. ELI contends that its role in the construction of Waterford 1 & 2 was limited to hiring Ebasco and agreeing to Ebasco's recommendation to retain McCarty as an independent contractor. Continuing, ELI contends that it never authorized, implicitly or expressly, McCarty to engage in any unsafe work practices. To the contrary, ELI points out that the contract between it and McCarty not only defined McCarty as an independent contractor, but also made McCarty responsible for providing a safe work place for its employees and complying with the applicable workplace safety rules, including the Occupational Safety and Health Administration Act of 1970 ("OSHA").[9] ELI emphasizes that the only work Mr. Joshua performed at Waterford 1 & 2 was while employed, directed, and controlled by McCarty. ELI thus contends that the independent contractor defense insulates it from tort liability to Mr. Joshua.
The plaintiffs counter that ELI erroneously assumes the jury held it liable for McCarty's actions. The plaintiffs contend that their case against ELI is not based on McCarty's negligence, but on ELI's independent negligence as a premises owner. The plaintiffs point out that ELI, in its capacity as a premises owner, had a duty to workers on its premises to discover, correct, and warn of hazardous conditions. Alternatively, the plaintiffs contend that McCarty was not an independent contractor.
In resolving this issue, it is necessary to distinguish between the two ways in which a premises owner can be liable to employees of contractors who are injured while working on its premises: "(1) directly, for its own negligence; (2) vicariously, for the negligence of the independent contractor." 1A Stuart M. Speiser, Charles F. Krause, & Alfred W. Gans, The American Law of Torts, § 4:23 (2003)(noting that "[m]any courts hold that the contractee [premises owner] is liable to the employees for its own negligence.")[10]
*852 As a general rule, a premises owner is not vicariously liable for the negligence of an independent contractor unless the owner retained control over the contractor's work or expressly or impliedly approved its unsafe work practice that led to an injury. Davenport v. Amax Nickel, Inc., 569 So.2d 23, 27-28 (La.App. 4 Cir. 1990); Ledent v. Guaranty Nat'l Ins. Co., 31,346, p. 11 (La.App. 2 Cir. 12/28/98), 723 So.2d 531, 537. Although the independent contractor defense is a bar to a vicarious liability claim, it is not a bar to direct liability claim arising out of a premises-owner's own negligence. See Sandbom v. BASF Wyandotte, Corp., 95 0335, p. 11 (La.App. 1 Cir. 4/30/96), 674 So.2d 349, 357.
In general, a premises owner has a duty of exercising reasonable care for the safety of persons on its premises and a duty of not exposing such persons to unreasonable risks of injury or harm. Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993).[11] This duty extends to employees of independent contractors for whose benefit the owner must take reasonable steps to ensure a safe working environment. Donavan v. Jones, 26,883 (La.App. 2 Cir. 6/21/95), 658 So.2d 755 (citing Dupre v. Chevron U.S.A., Inc., 20 F.3d 154 (5th Cir.1994)). Whether a premises owner has breached the duty is a question of fact to which the manifest error standard of review applies. Mundy, 620 So.2d at 813; See Siverd v. Permanent General Ins. Co., XXXX-XXXX, p. 5 (La.2/22/06), 922 So.2d 497, 501 (noting that "[w]here two permissible views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong.")
Applying these principles to the facts of this case, the plaintiffs assert both vicarious liability claims arising out of Mr. Joshua's work activity with McCarty and direct liability claims for ELI's independent negligence.[12] Although the plaintiffs' *853 vicarious liability may be precluded by the independent contractor defense (or by the trial court's finding that McCarty was not negligence discussed below), their direct liability claims for ELI's own negligence are not precluded. Assuming, arguendo, that the plaintiffs' vicarious liability claims are precluded, the issue is whether the jury's factual finding that ELI breached its duty as premises owner in exposing Mr. Joshua to asbestos at Waterford 1 & 2 is supported by the record. To resolve this issue requires that we review the evidence presented at trial regarding Mr. Joshua's exposure to asbestos at Waterford 1 & 2.
Mr. Brooks, Ebasco's construction manager, testified that in early 1970s Ebasco was constructing and engineering power plants on a world-wide basis and knew of the hazards related to asbestos exposure. Indeed, he emphasized that OSHA was enacted in 1970. In 1971, Ebasco signed a contract with ELI (then LP & L) for the construction of Waterford 1 & 2, a power generation facility. Under the contract, Ebasco agreed to act as ELI's agent and to assume complete control over the entire construction project.[13]
In 1973, ELI and Ebasco signed a contract with McCarty for it to install asbestos-free thermal insulation on the piping and equipment. As part of its contract, McCarty was required to insulate the turbine generator; however, ELI was required to provide the insulation materials for the turbine generator. McCarty was not the only insulation contractor involved in the construction of Waterford 1 & 2. The boiler contract, which called for the installation of thermal and other types of insulation, was awarded to Riley-Stoker. Riley Stoker awarded the contract to insulate the boiler to ANCO. ANCO was thus an insulation subcontractor that worked at Waterford 1 & 2 for Riley-Stoker.
Another contractor on the job was Peter Kiewit & Sons. Peter Kiewit was awarded the contract to install the piping work. Ebasco's contractual specifications for the piping work done by Peter Kiewit called for the use of asbestos-containing paper, blankets (or mattresses), and gaskets. Mr. Brooks testified that at that time OSHA required that if asbestos materials were to be used, they had to be used in isolated areas (such as a doghouse) so that the materials could not get out of the enclosure. Mr. Brooks testified that the pipe fitters, employed by Peter Kiewit, and the insulators, employed by McCarty, did not work side-by-side. Rather, the pipe fitters always worked ahead of the insulators because the piping had to be totally complete and tested before the insulation could begin.
Three co-workers testified that asbestos products were used during the initial construction of Waterford 1 & 2: Mr. Lewis, an employee of McCarty; Mr. Bourque, an employee of Peter Kiewit; and Mr. Williams, an employee of Process Insulators.
Mr. Lewis, a laborer and foreman for McCarty, confirmed that asbestos pipe covering, blankets, and quilts were used at Waterford 1 & 2. Describing the asbestos *854 products that were used, Mr. Lewis testified that "[t]hey had all kinds of products with the insulation products, white cover, pipe covering, they had the blankets. They had the thing they call it quilts, all those different things."
Mr. Lewis further testified that Mr. Joshua was a carpenter who was hired out of the union hall and that he worked right by Mr. Joshua. Mr. Lewis estimated that he would see and talk to Mr. Joshua six or seven times each work day. Mr. Lewis described Mr. Joshua's job duties as building scaffolds for the insulators and tearing them down. According to Mr. Lewis, when the insulators cut the asbestos-containing products, it would create "a real lot of dust" on the work site. He also described how dust would be created when the carpenters tore down the scaffolds at the end of the day. Dust and debris would collect on the boards and when the carpenters broke the boards and flipped them over, the dust and debris would get into the air. More dust would be created when the laborers swept it up at the end of the day. Mr. Lewis indicated that the only preventive measure that was taken to control the dust was that they were given a "little dust mask." Mr. Lewis testified that he and Mr. Joshua breathed the dust.
Mr. Bourque, a welder for Peter Kiewit, testified that he worked at Waterford 1 & 2 from 1973 to 1975. In insulating the heavy wall pipe, Mr. Bourque testified that the welders used "asbestos paper, fiberglass blankets and asbestos cloths." The asbestos paper, cloth, and blanket came packaged on a roll and generally were stored on the heater deck, the area where the turbine was assembled. When they cut the asbestos-containing products, it would create visible dust.
Mr. Bourque testified that block-type, asbestos insulation was used by the insulators at Waterford 1 & 2 on all the process piping and on the sides of the boiler. According to Mr. Bourque, dust was created when the insulators cut the insulation, and the area in which the insulators worked looked like "a snow storm."
Mr. Bourque testified that he thought the block insulation, cloth (or blanket), and paper contained asbestos for two reasons: (i) his supervisor told him it did, and (ii) because they were using and exposing the products at excessively high temperatures. He further testified that "[e]veryone on the job more or less knew that is asbestos insulation. That is what they were using" and that "[i]n 1975 asbestos was good stuff."
According to Mr. Bourque, the welders used asbestos paper and cloth in stress relieving work.[14] Although he acknowledged that the stress relieving work was done in a "contained area," he testified that the area was not really contained for two reasons. First, "[i]t was a contained area until they demo it and let everything fall out of it." He explained that at the end of the day, they would take down the side of the building and the roof and that you could hear the stuff falling down through the building. Second, even when they were stress relieving, Mr. Bourque explained that the area was not necessarily contained because "[t]hey had a doorway *855 cut open and we cut holes in the Visqueen and when they start stress relieving, we would close them up and tape it up." He further explained that they would close the holes they cut in the Visqueen with duct tape.
Mr. Bourque testified that the welders also used asbestos-containing gaskets and that he personally removed gaskets at Waterford 1 & 2. Agreeing that it might be possible to remove a gasket with a screwdriver, Mr. Bourque explained that there still would be fibers stuck to the flange that had to be removed with a grinder. He further explained that "[i]t will leave a residue behind it. Once you compress something that tight, it leaves particles on the flange." Mr. Bourque still further explained that gaskets that have been heated likewise would stick to the flange and that to remove the gaskets they would have to grind them off and "the fibers would fly all over."
Similar to Mr. Lewis, Mr. Bourque described the process of taking down scaffolds. He stated that the material from the welds would fall down and "whatever dust was left from other procedures and all, the cloths and stripping of the welds were falling down also." He also stated that it was broom swept and that no protective measures or precautions were employed during the cleaning up process. Peter Kiewit neither told him anything about asbestos, nor provided him with any respiratory protection. Although Mr. Bourque testified that each contractor had its own carpenters, he also testified that all the crafts worked together and that there was no segregation of the work.
Mr. Williams, an insulator for Process Insulators, testified he worked at Waterford 1 & 2 during the early 1970s. He loaded and unloaded asbestos containing insulation from box cars. Some boxes were marked non-asbestos and some were not. His supervisor warned him and other insulators on the job to stay away from the products that were not marked non-asbestos. The products he was certain contained asbestos were Unibestos and asbestos cloth. He knew the Unibestos contained asbestos because it had distinct characteristics from other insulation such as its hardness. Mr. Williams testified that asbestos cloth was used around turbines, and Unibestos was used on piping and was stored in a warehouse in front of the unit. When the Unibestos was cut, other crafts, including laborers and carpenters, would be in the area, and it would create a dusty atmosphere. He described the work the carpenters did at Waterford 1 & 2 as including building and tearing down scaffolding. Similar to the other two co-workers, Mr. Williams described how dust would get into the air when the carpenters tore the scaffolding boards down at the end of the day. Similar to Mr. Bourque, Mr. Williams testified that all the crafts worked together and that there was no segregation in the dusty work environment. He further testified that all the crafts breathed the dust.
Contrary to Mr. Williams' testimony, Mr. Brooks testified that Process Insulations never worked at Waterford 1 & 2. Moreover, ELI established at trial that the piping work had not yet begun at the time when Mr. Williams claims he was working at ELI insulating the pipes. As ELI emphasizes, Mr. Williams was not at Waterford 1 & 2 at the time Mr. Joshua worked there. Moreover, Mr. Williams acknowledged that he had no idea what products were used at Waterford 1 & 2 during the time Mr. Joshua was there.
Mr. VonBodungen testified as the corporate representative for ELI most knowledgeable about asbestos issues, including the use of asbestos at Waterford 1 & 2. Mr. VonBodungen acknowledged that at *856 the time of the trial a "Danger" sign was posted on the gate at Waterford 1 & 2 that read:
BREATHING ASBESTOS FIBERS CAN CAUSE CANCER AND LUNG DISEASE. This facility has materials that may contain asbestos. These materials include, but are not limited to: Thermal insulation and related materials, sound proofing, transite panels and piping, floor tile, roofing, packing and gaskets. These materials should be considered to contain asbestos and treated as such, unless indicated by labeling or otherwise determined to be non-asbestos. Contact your supervisor for proper identification and handling.
Mr. VonBodungen described the sign as a generic one and testified that it was posted to satisfy governmental regulations.
Mr. VonBodungen further testified that testing was done in 2002 of some mastic material in the turbine doghouse area. The samples, which the lab described as gray spray-on insulation, were found to contain asbestos. Mr. VonBodungen also testified about his own sampling for possible asbestos, stating:
We were concerned about as far as the practice of insulators at this time of construction had big inventories of asbestos material. And they would put two layers on there and the asbestos would be on the bottom layer hidden. So in an effort to clear that up and to take a correct sample, just core it to get both layers, so that way we knew we went through and through what was representative on the pipe.
Mr. VonBodungen acknowledged that he had no information or knowledge that McCarty brought any asbestos containing products onto Waterford 1 & 2.
Dr. Rose, the plaintiffs' industrial hygienist, testified regarding the information that was available during the time Waterford 1 & 2 was being constructed regarding the hazards posed by exposure to asbestos.[15] During the late 1970s and 1980s, industrial hygienists stopped seeing asbestos-containing insulation or spray being used in the construction of new buildings or facilities. Although during this time period manufacturers had stopped making asbestos-containing insulation products, suppliers still had asbestos containing products stored in their warehouses. Dr. Rose characterized this time period, which coincided with the timing of the construction of Waterford 1 & 2, as a transitional period. During this transitional period, Dr. Rose explained that a problem arose because "even for a couple of years it [asbestos-containing material] was still sneaking in." Given that Waterford 1 & 2 was constructed during this transitional period coupled with the knowledge of what was occurring with suppliers during this period, Dr. Rose opined that he would have required "a sample to be taken and paid for by either people I worked for or the insulation supplier." He reiterated that "[a]gain, I say that '72, '73, '74, I think that their [antenna] should be up and they should be a little leery and ask for some documentations and samples."
Dr. Rose further testified that to the extent ELI specified the use of asbestos containing products at Waterford 1 & 2, such as gaskets and blankets, ELI shared in the responsibility for the exposure to such asbestos-containing products that took place on its premises.
*857 Dr. Rose still further testified regarding his understanding of the nature of Mr. Joshua's work at Waterford 1 & 2. According to Dr. Rose, Mr. Joshua was a carpenter whose primary responsibility was building and taking down scaffolding. Assuming Mr. Joshua was exposed to asbestos while working at ELI's Waterford facilities, Dr. Rose opined that ELI was "negligent if they did not tell him or tell his employer that there was asbestos there." Based on his review of depositions and documents in this case, Dr. Rose further opined that ELI "did not take the control preventative measures and control steps necessary, certainly at the time that Mr. Joshua worked out there, regarding reducing and preventing exposures to any asbestos that may have been there or may have been released." Although Dr. Rose testified that it was reasonable for ELI to rely on the contractual requirement that asbestos-free insulation be used, he further testified that ELI should have done sampling. As discussed above, Dr. Rose's opinion was that due to this transitional period during which the Waterford 1 & 2 was constructed, ELI should have required samples be taken of the insulation that was being installed on its property.
Given the above evidence, we cannot say the jury was manifestly erroneous in finding ELI was negligent, i.e., that ELI breached its duty as a premises owner by exposing Mr. Joshua to asbestos at Waterford 1 & 2.

2. McCarty's Directed Verdict
ELI's first two assignments of error are intertwined. ELI argues that in the event this court affirms the jury's finding that it was negligent insofar as Mr. Joshua's exposure to asbestos at Waterford 1 & 2, it logically follows that there was sufficient evidence for the jury to find McCarty was negligent in failing to provide Mr. Joshua with a safe place to work. ELI argues that the trial court erred in granting McCarty's motion for directed verdict because the evidence established that (i) if asbestos-containing thermal insulation was installed at Waterford 1 & 2, McCarty installed it; (ii) McCarty's use of asbestos-containing thermal insulation violated the contract specifications; and (iii) McCarty's conduct, as Dr. Rose testified, "definitely" breached its duty to provide Mr. Joshua with a safe place to work.
Plaintiffs counter that in attempting to blame McCarty, ELI focuses solely on the alleged presence of asbestos insulation, theorizing that because McCarty allegedly sneaked it onto ELI's property unbeknownst to ELI and in violation of its contract, only McCarty is liable. Plaintiffs contend that, contrary to ELI's theory, Mr. Joshua was exposed at Waterford 1 & 2 not only to asbestos insulation, but also to asbestos cloth, blankets, and gaskets.
McCarty counters that ELI waived the right to raise this issue by failing to timely object to the trial court's granting of the motion as required by La. C.C.P. art. 1635.[16] Alternatively, McCarty contends that there was no evidence presented that it applied asbestos containing products or knew that Mr. Joshua may have been exposed to asbestos-containing products, but there was evidence that other contractors *858 used asbestos-containing products at Waterford 1 & 2.
In a jury trial, a party may move for directed verdict at the close of an opponent's evidence. La. C.C.P. art. 1810. A directed verdict is proper when, considering all of the evidence in the light most favorable to the non-mover, it is clear that the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable jurors could not reach a contrary verdict. Cross v. Cutter Biological, Div. of Miles, Inc., 94-1477, p. 29 (La.App. 4 Cir. 5/29/96), 676 So.2d 131, 148. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. Id.
The standard of review on appeal of a directed verdict is whether reasonable persons could not reach a contrary verdict under the evidence. Davis v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 2003-2219, pp. 7-8 (La.App. 4 Cir. 11/17/04), 887 So.2d 722, 727. The question to be asked by the appellate court is not whether plaintiff proved his case by a preponderance of the evidence, but rather, whether upon reviewing the evidence submitted, the court could conclude that reasonable persons could not have reached a verdict in favor of plaintiffs. Id. The appellate court also must determine if the record supports the granting of a directed verdict, based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law). Id.; Lott v. Lebon, 96-1328, p. 4 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 616. A directed verdict should be sustained on appeal where the reviewing court would find a jury verdict in favor of the party opposing the motion to be manifestly erroneous had the trial judge allowed the case to go to the jury. Wichser v. Trosclair, 99-1929 (La.App. 4 Cir. 2/28/01), 789 So.2d 24.
Applying these principles, we find no error in the trial court's decision granting McCarty's motion for directed verdict.[17] McCarty's duty as an employer is governed by La. R.S. 23:13, which in pertinent part provides:
Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees.
La. R.S. 23:13. As noted, in support of its argument that McCarty violated this statutory duty, ELI cites Dr. Rose's testimony that McCarty "definitely" violated its duty to provide a safe work place. We find, as McCarty argues, that there is no evidence in the record establishing McCarty violated its duty as an employer under this statute.
Dr. Rose's testimony that ELI relies upon is as follows:
Q. Now, let's assume that the contractor informed Ebasco under the contract specifications, that we are going to be *859 installing asbestos-free insulation. But the contractors brought in some asbestos-containing insulation. If that were the case, would you say the contractor breached the duty to provide a safe place?
A. Definitely.
Q. Do you believe that it would be the contractor's responsibility for telling the owner of the premises that he was bringing a hazard onto the premises?
A. Definitely.
ELI's reliance on Dr. Rose's testimony is misplaced. Dr. Rose's testimony is based on the hypothetical that a contractor violated its contract by bringing asbestos onto Waterford 1 & 2. Although ELI cites the testimony of Mr. Lewis and Mr. Bourque as establishing McCarty brought asbestos onto the premises, neither witness expressly identified McCarty as the insulator that brought asbestos onto the premises. Although Mr. Lewis testified that asbestos-containing insulation was used at Waterford 1 & 2, he also testified that ANCO was on the job working as an insulator. Mr. Lewis was not asked whether it was McCarty or ANCO that was using asbestos-containing insulation. At best, an inference can be made from Mr. Lewis's testimony that he was referring to McCarty when he testified about asbestos-containing insulation being used at Waterford 1 & 2. Similarly, although Mr. Bourque testified that insulators were working around him using asbestos-containing materials, he did not identify the insulations as McCarty's insulators.
Moreover, Mr. Bourque testified that while working for Peter Kiewit he used asbestos cloth, paper, and gaskets. Although ELI contends that Mr. Joshua was not exposed to these other asbestos-containing products, the trial court and the jury apparently disagreed. Thus, as McCarty contends, the jury's finding that ELI was negligent is not inconsistent with the trial court's finding that McCarty was not. Finally, as McCarty stresses, no evidence was presented that McCarty was aware that other contractors were using asbestos containing products to which Mr. Joshua may have been exposed at Waterford 1 & 2.
Based on our review of the record, we find no error in the trial court's decision granting McCarty's motion for directed verdict.

3. ELI's liability for Waterford 3  Substantial Factor
In challenging the jury's finding of fault for exposure to asbestos at Waterford 3, ELI contends the plaintiffs failed to carry their burden of proving either that Mr. Joshua was exposed to asbestos there or that, assuming he was exposed, ELI was negligent. Stated otherwise, ELI argues that there was absolutely no evidence that Mr. Joshua was ever exposed to asbestos-containing products at Waterford 3 or that any such exposure was a substantial factor in causing his asbestos-related injury. ELI further points out that the plaintiffs' theory of exposure as to Waterford 3 is different than their theory of exposure as to Waterford 1 & 2. ELI notes that the plaintiffs apparently concede that the insulation at Waterford 3 was asbestos free and thus focus on other sources of asbestos exposure; namely, asbestos floor tiles and gaskets.
In evaluating liability in an asbestos case, traditional tort liability theories, including negligence, apply and require proof of causation. Emery v. Owens-Corp., 2000-2144, p. 12 (La.App. 1 Cir. 11/9/01), 813 So.2d 441, 452 (citing Quick v. Murphy Oil Co., 93-2267, p. 8 (La.App. 4 Cir. 9/20/94), 643 So.2d 1291, 1294). A substantial factor test is used *860 by Louisiana courts to determine whether exposure to a particular asbestos-containing product was a cause-in-fact of a plaintiff's asbestos-related disease. Egan v. Kaiser Aluminum & Chemical Corp., 94-1939, p. 11 (La.App. 4 Cir. 5/22/96), 677 So.2d 1027, 1034-35 (citing Quick, supra); see also Vodanovich v. A.P. Green Industries, Inc., XXXX-XXXX, pp. 3-4 (La. App. 4 Cir. 3/3/04), 869 So.2d 930, 932-933; see also Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir. 1973). Although those cases involved product liability defendants and this case involves a premises owner defendant, we have held that the same causation standard applies. Zimko v. American Cyanamid, XXXX-XXXX, p. 26 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 485, writ denied, 2005-2102 (La.3/17/06), 925 So.2d 538. Simply stated, the exposure has to be a substantial contributing factor to the plaintiff's disease. Id.
Causation is a factual finding that should not be disturbed unless the record does not furnish a basis for that finding, and it is clearly wrong or manifestly erroneous. Egan, 94-1939 at p. 11, 677 So.2d at 1034 (citing Ambrose v. New Orleans Police Dep't Ambulance Service, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221). "Whether the defendant's conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ." Borel, 493 F.2d at 1094.
In this case, the jury found Mr. Joshua was exposed to asbestos at Waterford 3 and that such exposure was a substantial factor in causing his lung cancer. Although ELI disputed medical causation at trial and argued that a finding of asbestosis is required to link lung cancer to asbestos exposure, ELI does not contest on appeal the jury's finding that Mr. Joshua's lung cancer was caused by asbestos exposure. Insofar as medical causation, we further note that the plaintiffs presented expert medical evidence at trial that Mr. Joshua's exposure to asbestos at the Waterford facilities was a substantial contributing factor to his lung cancer and plural plaques. Dr. Gomes testified that "any exposure to asbestos over the course of one's work is felt to be a significant factor in contributing to the development of asbestosis or lung cancer." He further testified that assuming Mr. Joshua breathed asbestos fibers while working at the Waterford facilities, those exposures would be "a substantial contributing factor in the development of lung cancer." Dr. Gomes expressed the same opinion as to Mr. Joshua's pleural plaques. ELI did not present any medical evidence to the contrary.
On appeal, ELI's argument focuses on the alleged lack of sufficient evidence of exposure to asbestos at Waterford 3. To resolve this issue requires that we review the evidence presented at trial on this issue.
Mr. Brooks, Ebasco's construction manager, testified that the contractual relationship between ELI and Ebasco with regard to Waterford 3 was essentially the same as it was for Waterford 1 & 2. He testified that there was no asbestos containing insulation at Waterford 3, but acknowledged that there was other asbestos-containing materials used at Waterford 3 in the form of floor tiles, gaskets, and certain other products. On this subject, Mr. Brooks testified that:
There were asbestos materials used in the form of gaskets. All of these other items that you are coming up with except with the tile were an integral part of a piece of equipment brought on the site. It was not used in the construction standpoint. It was installed with that already in place.
*861 An illustration of an asbestos-containing item used at Waterford 3 that came as an integral part of a piece of equipment is the turbine wedges. Mr. Brooks testified that "[t]he turbine wedges came inside the starter which is a totally shop-built piece of equipment." Finally, Mr. Brooks testified that the only place at Waterford 3 that he was aware of asbestos-containing floor tile being installed is the Ebasco construction office.
Mr. Houghtaling, who testified as the corporate representative for ELI most knowledgeable about asbestos issues, including the use of asbestos at Waterford 3, testified that ELI's intent was to build Waterford 3 asbestos-free from an insulation point of view. However, he testified that asbestos was specified for products such as floor tile and gaskets.
As to the floor tile, Mr. Houghtaling testified that the specifications called for the use of Kentile vinyl asbestos floor tile. He further testified that he did not think there was ever a lot of floor tiles installed and that he only knew of one building in the plant that had vinyl asbestos floor tile, the Ebasco site support building, which is still in place.
As to the gaskets, Mr. Houghtaling agreed that asbestos-containing gaskets were used in the construction and maintenance of Waterford 3. He explained that "at the time the plant was designed, asbestos gaskets, or gaskets that contained asbestos in their compound were specified by design." Mr. Houghtaling testified that the typical way to remove a gasket is with a putty knife. He further testified that the Root Cause Report, which is discussed elsewhere in this opinion, refers to the improper use of grinding tools to remove a gasket. Mr. Houghtaling acknowledged that the Root Cause Report included "the listing of the over 600 stock codes that refer to asbestos and Garlock 900," which is an asbestos-containing gasket.
Besides the specifications, another reason why it was known that asbestos was used at Waterford 3 was that there were reports regarding asbestos being found in certain areas of the facility. One such report that Mr. Houghtaling was questioned about was entitled the "High Pressure Turbine Enclosure Asbestos Removal" Modification Request. This report states that during a 1990 project "to install louvers in the HP [i.e., high pressure] turbine enclosure [the doghouse], the sound proofing material on the enclosure was determined to contain asbestos fibers." According to Mr. Houghtaling, this asbestos-containing material was painted on the inside of the doghouse by the fabricator; it was not applied at the Waterford 3 site.
Mr. Houghtaling also was questioned about an industrial hygiene report that was prepared in 1997. The report discussed, among other things, bulk sampling that was done to identify: "(1) asbestos presence in the Site Support Building floor tiles, ceiling tile, and insulation; and (2) asbestos presence in the HP Turbine Doghouse blanket and spray applied thermal insulation." The majority of the samples (7 out of 10) were taken from the site support building and one of them  a floor tile sample  tested positive for asbestos. The other samples (3 out of 10) were from the doghouse area, and one of them tested positive for asbestos. The industrial hygiene report also discussed area samples that were collected during the removal of the turbine wedges. Mr. Houghtaling testified that it was his understanding that the turbine wedges included in their composition a significant amount of asbestos fibers.
Mr. Houghtaling identified pump packing and arc chutes as other asbestos-containing materials that were used at Waterford *862 3 besides the floor tiles and the gaskets. Mr. Houghtaling also identified galbestos, which was sprayed on one of the construction buildings, as another asbestos-containing material used at Waterford 3. He explained that galbestos is a type of paint coating. He further testified that at the time of trial there was a warning label on that building stating that it contains asbestos. Finally, he testified that ELI's employee training manual provides that "[a]sbestos materials are identified in some areas of the plant and they are marked with an asbestos label, all thermal and system insulation is presumed to be asbestos-containing material, unless otherwise identified as not containing asbestos."
Two co-workers  Mr. Cosse and Mr. Landry  testified regarding the presence of asbestos-containing floor tiles and gaskets at Waterford 3.
Mr. Cosse, who was a foreman and general foreman, testified that he worked at Waterford 3 from 1974 to 2002. Like Mr. Joshua, Mr. Cosse first worked for J.A. Jones and then for Ebasco. Mr. Cosse testified that he first met Mr. Joshua in the 1970s when they were working for J.A. Jones at Waterford 3. At that time, Mr. Cosse was a supervisor, and Mr. Joshua worked under him. According to Mr. Cosse, the work he did was to "tear down buildings and cut holes in the buildings and install air conditioning, remodel them, tear down trailers, put up trailers, remov[e] flooring, put down flooring. That was my constant thing." When he removed tile flooring, he would use a file scrapper. Because the tile was brittle, it would crack into "millions of pieces" and create a dusty atmosphere. When asked how many buildings he tore out floor tile from, Mr. Cosse replied that "[a]t one time we had over 100 trailers and 30, 40 buildings, very few we didn't work in."
Mr. Cosse testified that there was no specification for the floor tiles on the jobs that he did, which involved temporary buildings. Although Mr. Cosse acknowledged that before the trial in this case he had not seen the specification to use vinyl asbestos tile at Waterford 3, he testified that the specification "does say tile. It says asbestos, it says vinyl. That is what I got. I got to deal with vinyl." Mr. Cosse added that the "particular tile I dealt with was there in the warehouse before I got there in '75. I just kept the same stuff." He explained that they standardized by buying a particular name brand and type of tile. He further explained that "99 percent of the time it was our tile was standard and the tile was in the buildings before I get there, so we had to match it. So I stuck with that color, that particular name brand," which was Kentile. He also testified that the floor tile that he removed was definitely the same as the tile that he applied. However, he agreed that he could not tell whether a piece of floor tile was asbestos containing or not.
Mr. Cosse further testified that he saw gaskets being applied or removed, that this was done at every outage, that the gaskets were ground off, that this was a normal thing, and that it always created dust. He noted that you could not grind a gasket without it creating dust. He further testified that the pipe fitters and welders would use scaffolds to get to the gaskets and that the carpenters would build and take down the scaffolding. When the carpenters would take the scaffolds down, the dust that collected on the boards would fall down. However, Mr. Cosse conceded that "90% of Mr. Joshua's work was remodeling buildings, taking them down and relocating materials" and that his crew very rarely did scaffold building. He also conceded that a lot of the work his crew did was foundation *863 work. Mr. Cosse stated that he was sure Mr. Joshua did not install any gaskets because that was not his trade.
Mr. Cosse testified that he did not know anything about asbestos being used until the late 1980s when he conducted a search of his computer in the materials and handling department at Waterford 3 for the keyword asbestos. When he did so, he retrieved "list, after list, after list, after list of stuff popping up. Most of it was gaskets." The reason he believed these asbestos-containing products were used during the construction of Waterford 3 was because of the order dates that were listed for most of the products. Mr. Cosse further explained that he was surprised because he thought asbestos was no longer being used. Lastly, Mr. Cosse testified that the first time he was warned about working around asbestos at Waterford 3 was in the late 1990s and that this made him mad because he had worked there for years.
Mr. Landry, another co-worker, testified that he worked at Waterford 3 for J.A. Jones and Ebasco and that he and Mr. Joshua worked together under Mr. Cosse. He noted that Waterford 3 was referred to as "trailer city" because it had about five hundred trailers. Mr. Landry testified that he changed the floor tile in the trailers, that scrapping up the tiles created dust, and that he and Mr. Joshua breathed the dust. Mr. Landry, however, agreed that he had no personal knowledge as to whether the floor tiles or any other products at Waterford 3 had asbestos.
Mr. Landry testified that he and Mr. Joshua primarily worked as carpenters and that ninety percent of their job was scaffolding, which was union work. He further testified that they built scaffolding in three places: (1) the containment area, (2) the turbine building, and (3) the turbine doghouse. He still further testified he worked at Waterford 3 with Mr. Joshua during a turnaround, which is a shutdown when everything is repaired. While working with Mr. Joshua, Mr. Landry testified that he saw pipe fitters removing gaskets.
Describing the process of removing gaskets, Mr. Landry explained that it involves the use of a grinder to clean the flange. He explained that "[m]ostly any time they change a gasket, they got to clean the flange. That consists of using a grinder." As a result, dust was created and would fall on the scaffolds. Dust was thus on the scaffolds when the carpenters removed them. Dust was also created by sweeping. Mr. Landry testified that no precautions were taken to control exposure to the dust. Although Ebasco provided them with air masks, it did not mandate they wear them.
ELI's expert industrial hygienist and toxicologist, Dr. Weir, testified that even if the gaskets contained asbestos and even if Mr. Joshua was in the area when the pipe fitters were using a grinder to remove them, the potential for asbestos exposure was not significant. Explaining why he did not believe the asbestos-containing gaskets posed a health threat to the workers, Dr. Weir stated:
Well, no. And for very good reason. First these are in caps. The reason for any asbestos fibers to be in this matrix is to hold it together when it is being pressed between two pieces of metal and to keep it together under a variety of circumstances. There's some area where they require asbestos in order to maintain its integrity because of chemical purposes. But it's there for specific purposes. But it's bound up tight into a matrix for the most part. And then all of the evidence that has been generated, including the evidence that I have worked on, shows that there is not important or harmful levels of asbestos *864 fibers released from the manipulation ever of those gaskets.
Dr. Weir testified that his opinion included the installation, removal, and preparation for installation of the gaskets. Dr. Weir also opined that it is scientifically unlikely that Mr. Joshua received physiologically meaningful exposures to asbestos fibers at the Waterford facilities.
Based on the record, including the testimony outlined above, we cannot say the jury was manifestly erroneous in finding that Mr. Joshua was exposed to asbestos-containing material while working at Waterford 3. Nor can we say that the jury was manifestly erroneous in finding that such exposure was a substantial factor in the development of Mr. Joshua's lung cancer. For these reasons, we affirm the jury's finding of liability on the part of ELI in its capacity as premises owner of Waterford 3.

4. Evidentiary error  striking Mr. Houghtaling's August 31, 2004 testimony
ELI contends the trial court abused its discretion in striking the second day of Mr. Houghtaling's testimony based on an alleged discovery infraction. The discovery infraction was ELI's failure to produce a copy of the contract between ELI (then LP & L) and Ebasco for the construction of Waterford 3. Before trial, ELI claimed that it could not locate the contract. During trial, ELI claimed to have found a copy of the contract. On Friday, August 27, 2004, ELI e-mailed a copy of the contract to the plaintiffs' attorney. On Monday, August 30, 2004, the plaintiffs called Mr. Houghtaling as a witness in his capacity as the corporate representative for ELI most knowledgeable about asbestos issues, including the use of asbestos at Waterford 3. ELI opted not to cross-examine Mr. Houghtaling at that time; rather, it reserved the right to recall him during its case. The next day, Tuesday, August 31, 2004, ELI called Mr. Houghtaling as its own witness. ELI never asked Mr. Houghtaling any questions regarding the contact or sought to introduce the contract into evidence. Nonetheless, at the end of his cross-examination of Mr. Houghtaling, the plaintiffs's counsel asked Mr. Houghtaling if he had reviewed the contract. Mr. Houghtaling replied that he had reviewed the contract on August 27, 2004. The plaintiffs's counsel then requested the trial court to sanction ELI for failing to produce the contract in response to the outstanding discovery requests. The trial court granted the motion and as a sanction instructed the jury to disregard Mr. Houghtaling's August 31, 2004 testimony.[18]
On appeal, ELI contends that the trial court abused its discretion in sanctioning ELI by striking the testimony because there was no prior order requiring ELI to produce a copy of the contract. The plaintiffs counter that the trial court acted within its inherent power to control the integrity of the trial by striking the testimony. Alternatively, the plaintiffs contend that even assuming the trial court erred in striking the testimony, the error was harmless because the second day of testimony was largely redundant of the first day of testimony that was not struck.
We find the testimony should not have been stricken. The plaintiffs were aware that ELI had not produced a copy of the contract, yet they failed to file a motion to compel production of the contract. Nor did the trial court ever enter *865 an order compelling production of the contract. See Wall v. Alleman, 488 So.2d 1130 (La.App. 2d Cir.1986)(discussing requirement of prior court order compelling discovery before imposing sanctions). Nor have the plaintiffs alleged any prejudice resulting from their untimely receipt of the contract. See Horton v. McCary, 93-2315 (La.4/1/94), 635 So.2d 199 (noting that among the factors to be considered in imposing sanctions is the prejudice to the other party). Given these circumstances, the trial court erred when it struck the testimony.
When, as here, there was an erroneous evidentiary ruling, an appellate court may only reverse on appeal if a "substantial right" of the appellant has been infringed upon. See La. C.E. art. 103(A)(providing that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.") "The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. And it is defendant's [the appellant's] burden to so prove." Emery, 2000-2144 at p. 7, 813 So.2d at 449. In this case, we find, as the plaintiffs contend, that Mr. Houghtaling's second day of testimony was largely redundant and cumulative of his first day of testimony. As a result, no substantial right of ELI has been infringed upon. The trial court's error in excluding Mr. Houghtaling's August 31, 2004 testimony thus was harmless error.

5. Evidentiary error  admitting the Root Cause Analysis Report
The Root Cause Analysis Report involved an incident that occurred in 2002 at Waterford 3 regarding the grinding of an asbestos-containing gasket. The report includes the following synopsis of the incident:
A question was raised by day shift regarding the work to be performed on the Feedwater pumps and turbine gaskets. The work did not specify if the materials was Asbestos or otherwise. Safety was called, and samples taken of the material. However since this was Friday March 29 (Good Friday) the lab commonly used was closed. As a precaution, a posting was placed marking the area as "Caution Possible Asbestos."
On an evening shift, a Contract Individual working nights for safety was requested to go look at the situation around the Feedwater pumps. The safety inspector was assigned to containment, but knowing the plant agreed to walkdown the area. The area had flagging and was marked as "Caution Possible Asbestos." Workers were in the marked area, and were not following the proper cautions for the area.
The Safety Inspector discussed the situation with the turbine deck supervisor, and discussed whether asbestos was present. The safety inspector believed, from previous experience as an employee of Entergy at Waterford-3 that there was no asbestos on the plant site, and was no longer used at the plant. The safety inspector directed that the posting of the area could be removed.
Later that night, the safety inspector received a phone call from the turbine deck supervisor informing him that the work was on Asbestos materials. The safety inspector indicated that the position should be re-installed, and only qualified individuals should be allowed to work on the equipment.
The report also indicates that the safety inspector apparently relied on his memory of the 1997 industrial hygiene report, which indicated that certain materials at Waterford 3 were asbestos free; however, the 1997 report did not include any sampling *866 of gaskets. As a result of the mistake, workers were allowed to work for about four to six hours removing an asbestos-containing gasket, a Garlock 900, using a motor driven wire wheel brush, and several workers were exposed to unknown concentrations of asbestos. As noted elsewhere, the report also stated that a review of ELI's computer database revealed that there were over 600 stock codes that used either asbestos or Garlock 900, which is an asbestos-containing gasket.
The report was introduced into evidence during Dr. Rose's testimony.[19] ELI contemporaneously objected to the introduction of the report for two reasons. First, ELI argued that the report was not relevant because it refers to an incident that happened in 2002 at Waterford 3, whereas, Mr. Joshua last worked there in 1985. Second, when plaintiffs' counsel referred to the recommended corrective action portion of the report, ELI objected on the basis that it is a subsequent remedial measure. The trial court overruled both objections.
On appeal, ELI reurges its evidentiary objections to the introduction of the report at trial. We separately address them.
First, ELI contends that the report should have been excluded because there is no connection between what took place in 2002 at Waterford 3 and what took place in 1985 during the construction of that facility. Citing Jones v. Parish of Jefferson, 95-659, p. 5 (La.App. 5 Cir. 11/28/95), 665 So.2d 570, 572, ELI argues that evidence of the subsequent 2002 incident is not admissible because the subsequent incident is not "substantially similar" to the incident at issue. The plaintiffs reply that the Jones case is distinguishable in that it involved subsequent accidents  slip and falls. The court in Jones reasoned that "evidence of subsequent accidents is relevant to establish that a thing is defective, provided that the accidents occurred at substantially the same place and under substantially the same conditions and are caused by the same or a similar defect as the accident sued upon." Id. (emphasis supplied). Regardless, the plaintiffs contend that the 2002 incident is relevant because asbestos in place in 2002 at Waterford 3 was there because it was installed during the initial construction of Waterford 3 when Mr. Joshua was exposed to it. Indeed, the plaintiffs point out that ELI made the same argument. We agree and find no error in the trial court's finding that the 2002 Root Cause Report is relevant.
The second ground on which ELI contends the report should have been excluded is based on the subsequent remedial measure exclusion codified in La. C.E. art. 407. The plaintiffs counter that the "other purpose" exception to Article 407 applies. The plaintiffs enumerate several "other purposes" for which the report was introduced; namely: (i) to impeach Mr. Houghtaling's testimony regarding the improper method of removing gaskets and ELI's policy of avoiding asbestos-containing products; and (ii) to prove ELI's responsibility, authority, and control.
The subsequent remedial measure exclusion is codified in La. C.E. art. 407, which provides:
In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in *867 connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility.
La. C.E. art. 407. In order for the subsequent remedial measure exclusion to apply, the evidence must show that (1) after an event, (2) remedial measures were taken, and (3) the evidence must be offered to prove either negligence or culpable conduct. 23 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence, § 5283 (1980).[20] The event referred to by the rule is the event in litigation. Id. In this case, the first requirement is not satisfied. "[T]he disputed evidence was not evidence of remedial measures which were implemented after the event in litigation." Northern Assurance Co. v. Louisiana Power & Light Co., 580 So.2d 351, 357 (La.1991). The Root Cause Report involves measures taken after a separate, subsequent event; it does not involve measures taken in response to the event in litigation. Indeed, the report involves an event that occurred over twenty years after Mr. Joshua last worked at Waterford 3. ELI reliance on Article 407 is thus misplaced. Given the report is both relevant and not barred by La. C.E. art. 407, we find no error in the trial court decision to admit the report.

6.Johns Manville's Liability
ELI contends that the jury was manifestly erroneous in failing to find Johns Manville liable. The plaintiffs counter that the jury did not err in concluding that there was insufficient evidence to conclude that Mr. Joshua's exposure to Johns Manville's asbestos-containing product substantially caused Mr. Joshua's lung cancer. The plaintiffs point out that "[w]hen a defendant urges the fault of a non-party, it is incumbent upon that defendant to provide evidence which preponderates that fault actually exists on the part of the nonparty." Joseph v. Broussard Rice Mills, Inc., XXXX-XXXX, p. 7 (La.10/30/00), 772 So.2d 94, 100. The plaintiffs contend that ELI failed to meet its burden of proof.
The jury found that Mr. Joshua's exposure to asbestos-containing products manufactured by Johns Manville was not a substantial contributing factor to the development of his asbestos-related disease. To determine whether the jury's finding was manifestly erroneous requires we review the evidence presented at trial on this issue.
Before working at the Waterford facilities, Mr. Joshua worked at Monsanto and on that job he cut transite, which is an asbestos-containing product manufactured by Johns Manville. The sole evidence regarding Mr. Joshua's job responsibilities at Monsanto was the testimony of his co-worker, Mr. Landry. The entirety of Mr. Landry's testimony regarding Mr. Joshua's work at Monsanto was as follows:
Q: Sir, do you remember working with Mr. Landry at the Monsanto Chemical Plant? I am sorry, with Mr. Joshua?
A. Yeah, we worked there. It's been awhile back. It wasn't for too long.
Q. I think it was about two or three months?
A. We probably worked on the cooling tower. I remember working with him. I don't know we build some scaffold for FRU-CON. There is a piping outfit we built some scaffold around a tank where *868 they had to have some insulation to be down there. It wasn't a long time job.
Q. Is it true that you and Mr. Joshua cut transite on that job?
A. This job here was particularly cooling tower, cooling tower had transite on it. All the outside that you see like a corrugated, it is not metal. It is transite. I know that consist of asbestos.
Q. Asbestos?
A. Yeah, right, now you can't even cut it unless you have permit and all that. You have to go through the EPA and all that.
Q. Did you and Mr. Joshua cut that transite on that job?
A. Yeah, but then they didn't need all that. You just went on and cutting it like you were cutting pieces of material. Nobody was worried about that.
Q. Isn't it true that Mr. Joshua was the guy who did most of the cutting of the transite?
A. Yeah, him being older man he would mostly stay on the ground and do the cutting for us, yeah.
As plaintiffs emphasize, Mr. Landry characterized the job as a short one, and he was not asked whether Mr. Joshua used a handsaw or a power saw to cut the transite.
The only other evidence in the record regarding Mr. Joshua's exposure to transite was the testimony of Dr. Weir, ELI's industrial hygienist and toxicologist. Dr. Weir's testimony was as follows:
Q. Now, if one is sawing transite with one releasing fibers in the air that in your opinion could exceed safe levels?
A. Depends on the way it's done. I mean, the power saw, there's plenty of energy being into it and the particles can become pretty small. If you're careful when you use a handsaw, particles are larger and perhaps don't cause as much. So, it depends on the technology that's used. But, indeed there is the potential there.
Q. It is foreseeable in your opinion by Johns-Mansville, that someone would use a power saw to cut transite?
A. That's a favored way of doing it, yes.
Q. It is a lot easier than a hand saw?
A. Well, for certain applications, yes.
Q. So, then, do you have an opinion that the transite would be an  would be a  let me put it this way. That the transite was a product that was unreasonabl[y] dangerous for its intended use?
A. That's complex in the way you ask that, because in my impression the transite itself wasn't at fault. It was the improper use of it that became the problem And, so, it was not  if it wasn't  if the warnings weren't there to suggest that you can deal with this safely, or you can deal with it unsafely, and here's how to deal with it safely. It wasn't the product, but it was the way it was utilized that made it unsafe.
Q. But the  Johns-Mansville wasn't telling the end user, your really need to do it this way because this is safe, and don't use a power saw because that's probably not safe?
A. And that there are ways to do it safely. Indeed, that's correct, there was no information of which I'm aware that they did provide that caution.
Although ELI contends that Dr. Weir testified that regardless of the manner in which transite was cut it presented an unreasonably dangerous condition, we read his testimony to be that transite could potentially be used safely. We further note that Dr. Weir testified that the problem was not the transite itself, but the manner in which it was used. As noted, *869 Mr. Landry was not asked how Mr. Joshua cut the transite.
Given Dr. Weir's testimony that the problem was the improper use of transite, the issue is whether Johns Manville breached its duty to warn of the improper use of transite. As the plaintiffs point out, the jury was instructed that a manufacturer has no duty to warn a sophisticated user, and Monsanto clearly falls within the ambit of a sophisticated user. We thus do not find any inconsistency in the jury's finding of fault on the part of Monsanto as premises owner and finding of no fault on the part of Johns Manville as manufacturer for failing to warn.
We further note that a manufacturer does not become liable based on a demonstration of minimal exposure; rather, substantial exposure must be established. Torrejon v. Mobil Oil Co., XXXX-XXXX (La. App. 4 Cir. 6/2/04), 876 So.2d 877. Again, Mr. Landry's testimony was that the Monsanto job was a short one. Accordingly, we cannot say that the jury was manifestly erroneous in failing to find under these facts that Mr. Joshua's exposure to transite manufactured by Johns Manville was a substantial factor in causing his lung cancer.

7. Quantum  excessive wrongful death award to Mrs. Joshua
ELI's final argument is that the $2.75 million wrongful death damages award to Mrs. Joshua was excessive. In reviewing a general damage award, the first inquiry is "whether the particular effects of the particular injuries to the particular plaintiff are such that there has been an abuse of the `much discretion' vested in the judge or jury." 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 14.14 (1999). The standard of review for abuse of discretion in awarding general damages is "difficult to express and is necessarily non-specific." Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089. The seminal case on that standard is Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), in which the court articulated it as follows:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
623 So.2d at 1261. Continuing, the Supreme Court in Youn explained that "[o]nly after such a determination of an abuse of discretion is resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion." Youn, 623 So.2d at 1260-61 (citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976)).
As the plaintiffs point out, all five of Mr. and Mrs. Joshua's adult children testified regarding their close-knit family relationship. However, as ELI points out, it is only contesting the excessiveness of the wrongful death award to Mrs. Joshua. Thus, the key testimony in determining whether that award is excessive is Mrs. Joshua's testimony.
Mrs. Joshua testified that she and Mr. Joshua were married for forty-eight years. They met at church in 1952, and were married in 1953. The day of Mr. Joshua's wake would have been their forty-eighth wedding anniversary. Mrs. Joshua testified *870 that it was terribly hard without her husband on holidays. She noted it was especially difficult to spend the day that would have been their fiftieth wedding anniversary without her husband.
Mrs. Joshua described her husband as a good Christian man, a hard worker, and a person that stayed home with his family. According to Mrs. Joshua, the thing Mr. Joshua enjoyed the most was being with his family. After he retired in 1987, Mr. Joshua found things to do around the house such as making a vegetable garden. Mrs. Joshua testified that she was a homemaker, who she stayed home and cared for the children, while Mr. Joshua worked. She characterized their marital relationship as a good one. She stated that they went shopping together and did everything together. Since she never learned to drive, Mr. Joshua took her everywhere she had to go. She often had to go to the doctor, and he would always take her. Describing how her life has changed, Mrs. Joshua testified that she now has to rely on her children to take her to doctor appointments. She also testified that she has sleepless nights and that she is often home alone.
Applying the Youn standard, we find an abuse of discretion in this case. We thus find it necessary to resort to a review of damage awards made in other cases. In so doing, we find the closest case to this one is Roberts v. Owens-Corning Fiberglas Corp., 2003-248 (La.App. 1 Cir. 4/2/04), 878 So.2d 631, 644, writ denied, XXXX-XXXX (La.12/17/04), 888 So.2d 863, which ELI cites. In Roberts, an award of $1 million to the surviving spouse of a mesothelioma victim was affirmed on appeal. The couple had been married for forty-five years. The wife quit her job to move to an apartment in Baton Rouge so that her husband could be closer to his doctors. The wife testified that she missed her husband greatly, especially around the holidays.
In this case, we likewise find that an award of $1 million would be the highest reasonable award that we could affirm. See Youn, supra. We thus amend the judgment to reduce the wrongful death award to Mrs. Joshua to $1 million.

DECREE
For the foregoing reasons, the judgment is amended to reduce the wrongful death award to Mrs. Joshua to $1 million and, as amended, is affirmed.
JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.
TOBIAS, J., concurs and assigns reasons.
TOBIAS, J., concurs and assigns reasons.
I respectfully concur in the majority's opinion. I write separately only to note one matter.
As I noted in my concurring opinion in Palermo v. Port of New Orleans, 04-1804, p. 1 (La.App. 4 Cir. 3/15/06), 933 So.2d 168, 187, 2006 WL 1047129 *16, a decision that is not yet final in this court for it presently is pending on an application for rehearing, I respectfully disagree with the majority's reliance on Zimko v. American Cyanamid, 03-0658 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, writ denied, 05-2102 (La.3/17/06), 925 So.2d 538.
One must clearly understand the factual and legal basis upon which Zimko was premised and its history.
Zimko was a 3 to 2 decision of this court. American Cyanamid was found liable to the plaintiff and Tate & Lyle was found not liable to the plaintiff. Neither American Cyanamid nor Tate & Lyle sought supervisory review from the Louisiana *871 Supreme Court, but the plaintiff did on the issue of the liability of Tate & Lyle. By implication, American Cyanamid had settled with the plaintiff or agreed not to pursue their appeal further. Thus, the Supreme Court was not reviewing the issue of the correctness of the majority opinion respecting American Cyanamid's liability. (See Judge Kirby's dissent in Zimko, 905 So.2d at 494-98, respecting American Cyanamid's liability.) Any person citing Zimko in the future should be wary of the problems of the majority's opinion in Zimko in view of the Louisiana Supreme Court never being requested to review the correctness of the liability of American Cyanamid.
The Court of Appeals of New York (that state's highest court) briefly alluded to the problem of Zimko in the case of In re New York City Asbestos Litigation, 5 N.Y. 3d 486, 495-96, 840 N.E.2d 115, 806 N.Y.S.2d 146, 151-52 (2005) and chose not to follow Zimko.
NOTES
[1] Units 1 and 2 are mirror image generating facilities, which were constructed contemporaneously. For ease of reference, we refer to them collectively as "Waterford 1 & 2." Unit 3 is a nuclear facility that was constructed on a site adjacent to Waterford 1 & 2.
[2] "Bystander" exposure is the term used to refer to indirect, as opposed to direct hands-on, exposure to asbestos in the occupational environment. See 1 Lawrence G. Cetrulo, Toxic Torts Litigation Guide § 5:8 (2004)(noting that "bystander" exposure occurs when an individual is exposed indirectly to a toxic substance on the job such as "[a] carpenter who is exposed to welding fumes while working at a construction site.")
[3] A "B-reader" is a specialist who is qualified by examination to read chest x-rays for the presence of asbestos-related lung disease.
[4] Mr. Thomas was not involved in the trial of this case.
[5] Dr. Brody testified regarding his experiments with mice and the pathogenesis of asbestos related diseases.
[6] ELI is not appealing that ruling.
[7] It was stipulated that the medical expenses were $68,940.97 and the funeral expenses were $5,704.40.
[8] The record does not contain a copy of the Motion for Judgment Notwithstanding the Verdict on Liability of the Non-Parties, which the Joshuas filed. However, the record does contain a copy of ELI's opposition to that motion, and the trial court's judgment denying that motion dated October 15, 2004.
[9] ELI also points out that Ebasco had its own work rules and safety program on site that included the contractors' employees.
[10] See Kenneth R. Meyer, Ivan J. Whittenburg, & Brian P. Sharkey, Emerging Trends in Asbestos Premises Liability Claims, 72 Def. Couns. J. 241, 243 (July 2005)(explaining the distinction between a premises owner's vicarious and independent (or direct) liability). Illustrative of direct (or independent) liability claims for a premises owner's own negligence are those involving "pre-existing conditions at the premises (e.g., the presence of asbestos pipe-covering) or conditions caused by others working in close proximity to plaintiff (e.g., the installation by others of asbestos insulation on a boiler)." Id.
[11] It is well settled that the duty/risk analysis applies in determining whether a defendant is liability for negligent conduct under La. C.C. art. 2315. The five elements of the duty/risk analysis are as follows:

(1) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element);
(2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element);
(3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element);
(4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and
(5) proof of actual damages (the damages element).
Roberts v. Owens-Corning Fiberglas Corp., XXXX-XXXX, p. 5, n. 5 (La.App. 1 Cir. 4/2/04), 878 So.2d 631, 638 (citing Perkins v. Entergy Corp., XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, p. 7 (La.3/23/01), 782 So.2d 606, 611). All five elements must be proven. Id. The element ELI contests in this case is breach of duty (the breach element).
[12] The plaintiffs alleged that the premises owner defendants are liable based on the following:

a. Failure to provide Mr. Joshua with a safe work place;
b. Failure to provide him with safety equipment;
c. Failure to provide him with correct, adequate, or proper safety equipment;
d. Reckless and negligent failure to disclose, warn or reveal critical medical and safety information to him regarding asbestos hazards in general and with regard to those specific hazards at his work site;
e. Reckless concealment and negligent failure to reveal critical medical and safety information from him regarding the safety and health risks associated with asbestos and asbestos-containing products at his work sites;
f. Failure to timely remove asbestos hazards from the work place;
g. Failure to properly supervise or monitor the work areas for compliance with safety regulations; and
h. Failure to provide a safe and suitable means of eliminating the amount of asbestos dust in the air.
[13] Mr. Brooks explained that a power generation facility has two major components: (1) a turbine generator that produces the power, and (2) a boiler that creates the steam to drive that turbine. The turbine contract was awarded to Allis-Chalmers. The turbine doghouse was supplied by Allis-Chalmers as part of its contract to supply the turbine generator.
[14] Mr. Brooks explained stress relieving, stating:

When you weld piping, you disrupt the molecular structure of the pipe and induces[(sic)] stresses into that pipe which under high temperature and high pressure could cause the pipe to fail. You go through a process of heating or annealing that pipe, bringing it up to a pre-set temperature at which point you soak the pipe; and you gradually reduce the temperature down even as you increase it in steps and it anneals the pipe consistent with the original structure that it had.
[15] It is undisputed that in the early 1970s, when Waterford 1 & 2 was constructed, the danger of exposure to asbestos was well documented. As noted, OSHA was enacted in 1970. In this regard, the plaintiffs also introduced a copy of the 1952 Act adding asbestosis as a covered occupational disease under the Louisiana Workers' Compensation Act.
[16] La. C.C.P. art. 1635 provides:

Formal exceptions to rulings or orders are unnecessary. For all purposes it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him.
[17] Given our finding that there was no error on the part of the trial court in granting the motion, we do not reach McCarty's alternative waiver argument.
[18] A divided panel of this court denied ELI's emergency writ application, finding it had an adequate remedy on appeal. Thomas v. A.P. Green Industries, Inc., 2004-C-1571 (La.App. 4 Cir. 9/2/04)(unpublished).
[19] As noted elsewhere, the report was also referenced during the testimony of other witnesses.
[20] Because La. C.E. art. 407 is based on the parallel federal rule of evidence, Rule 407, we find it appropriate to look to the jurisprudence construing the federal rule for guidance.