STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-265

Consolidated with

23-270

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, ET AL.

VERSUS

ALLIANCE DRILLING CONSULTANTS, L.L.C., ET AL.

**********

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 39558
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

**********

CHARLES G. FITZGERALD
JUDGE

**********

Court composed of Van H. Kyzar, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

AFFIRMED.

Sharon L. Andrews
Desirée M. Valenti
Andrews Valenti, LLC
7733 Maple Street
New Orleans, Louisiana 70118
(504) 799-2585
Counsel for Plaintiff/Appellant:
    Petro-Hunt, L.L.C.

**Loretta G. Mince**
**Paul C. Thibodeaux**
**Fishman Haygood, L.L.P.**
**201 St. Charles Avenue, 46th Floor**
**New Orleans, Louisiana  70170**
**(504) 586-5252**
**Counsel for Plaintiffs/Appellants:**
> **Certain Underwriters at Lloyd's, London**

**George H. Lugrin, IV (pro hac vice)**
**Hall Maines Lugrin, P.C.**
**2800 Post Oak Boulevard, Suite 6400**
**Houston, Texas  77056**
**(713) 871-9000**
**Counsel for Plaintiffs/Appellants:**
> **Certain Underwriters at Lloyd's, London**

**Michael P. Cash**
**Liskow & Lewis**
**First City Tower**
**1001 Fannin Street**
**Houston, Texas  77002**
**(713) 651-2900**
**Counsel for Defendants/Appellees:**
> **XTO Energy, Inc.**
> **XH, L.L.C.**

**Paul Matthew Jones**
**Liskow & Lewis**
**450 Laurel Street, Suite 1601**
**Baton Rouge, Louisiana  70801**
**(225) 341-4660**
**Counsel for Defendants/Appellees:**
> **XTO Energy, Inc.**
> **XH, L.L.C.**

**Kathryn Z. Gonski**
**Jaclyn E. Hickman**
**Liskow & Lewis**
**701 Poydras Street, Suite 5000**
**New Orleans, Louisiana  70139-5099**
**(504) 581-7979**
**Counsel for Defendants/Appellees:**
> **XTO Energy, Inc.**
> **XH, L.L.C.**

**FITZGERALD, Judge.**

This consolidated appeal is from two trial court judgments. The first judgment dismissed Plaintiffs' breach of contract claims against Defendants. And the second awarded costs to Defendants, including expert fees.

## FACTS AND PROCEDURAL HISTORY

The dispute here stems from the blowout of an oil well in Lasalle Parish in July 2014.

The oil well at issue was drilled pursuant to a 1983 Joint Operating Agreement (JOA) between Petro-Hunt LLC and XH LLC. Under the JOA, Petro-Hunt was the non-operating working interest owner, and XH was the designated operator and residual interest owner.

In 2008, XTO Energy, Inc. entered into an Agency Agreement with XH permitting XTO to "manage all of the oil and gas interest held by XH."

Six years later, XTO—in accordance with the JOA and Agency Agreement—approached Petro-Hunt about drilling the subject well. Petro-Hunt agreed to participate. Thereafter, XTO contracted with D&D Drilling & Exploration Inc. to drill the well. XTO also engaged Alliance Drilling Consultants Inc. to supply drilling consultants and wellsite supervisors, including Clifton Pritchard. Drilling operations began on July 8, 2014. The blowout occurred three days later.

In the months that followed, Petro-Hunt was compensated for some of its losses by its first-party insurer, Certain Underwriters at Lloyd's, London. Then, in 2015, Petro-Hunt and Lloyd's (collectively "Plaintiffs") filed suit against numerous defendants for negligence, gross negligence, and breach of contract.

The original defendants were XH, XTO, D&D, Alliance, Pritchard, and the insurer for Alliance and Pritchard. But prior to trial, Plaintiffs settled with D&D,

Alliance, and Pritchard. Plaintiffs also voluntarily dismissed all tort claims. Thus, the remaining defendants at trial were XH and XTO (collectively "Defendants"). And the remaining claims against them were for breach of contract—breach of both the JOA and Agency Agreement.

A six-day jury trial was held in March 2022. The jury ultimately rejected Plaintiffs' claims, finding that no breach of contract had occurred. This verdict was reduced to a written final judgment signed by the trial court on June 1, 2022. Defendants, in turn, filed a motion for costs. A two-day hearing followed. The judgment on costs was signed on February 1, 2023. And that judgment taxed Plaintiffs with all costs, including Defendants' expert fees of $445,292.32. Plaintiffs timely appealed both judgments.

On appeal, Plaintiffs assert the following assignments of error:

1. The district court's ruling and jury instruction that only the direct acts or omissions of XH and XTO—and not those of the contractors to whom they delegated the performance of their contractual obligations—could be considered in determining whether XH and XTO breached their contractual obligations were error.

2. The district court's finding, and subsequent jury instruction, that Plaintiffs' breach of contract claims against XTO under the Agency Agreement required a showing of gross negligence, was error.

3. The district court's ruling that comparative fault applied to Plaintiffs' breach of contract claims, and its jury instructions reflecting same, were error.

4. The district court's exclusion of evidence in XTO's "root cause analysis" report regarding the cause of the blowout was error.

5. The district court erred in its decision to award 100% of the expert fees for experts who did not testify at trial. The district court abused its discretion in awarding any expert fees to Defendants where the experts—Mr. Bazer and Mr. Gilbert—did not testify at trial. Alternatively, should this court find that costs

2

should be taxed against Plaintiffs for non-testifying experts—Mr. Gilbert and Mr. Bazer—the costs should be reduced.

6. The district court abused its discretion in awarding depositions costs to Defendants where the depositions were not "used on the trial." The district court abused its discretion in awarding 100% of expert fees billed by testifying expert—Mr. McBeath—for work expended on Daubert hearings, Plaintiffs' expert depositions, the expert's own depositions, assistance of counsel, or travel expenses.

7. The district court abused its discretion in awarding 100% expert fees where Defendants failed to prove XH and XTO paid the fees.

8. The district court abused its discretion in awarding 100% expert fees where experts were shared by Settling Defendants, and unrelated cases, and XH and XTO failed to prove the amount of their portion of the expert fees billed.

9. The district court abused its discretion in awarding deposition costs to Defendants where the depositions were not used in the trial in accordance with La.R.S. 13:4533.

## LAW AND ANALYSIS

**First Assignment of Error**

This assignment seeks review of the trial court's jury instructions pertaining to the breach of contract claims. The appropriate standard of review for erroneous jury instructions was addressed in *Adams v. Rhodia, Inc.*, 07-2110 (La. 5/21/08), 983 So.2d 798. There, the Louisiana Supreme Court explained:

Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct jurors on the law applicable to the cause submitted to them. The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate. *Baxter v. Sonat Offshore Drilling Inc.*, 98-1054, p. 6 (La.App. 1 Cir. 5/14/99), 734 So.2d 901, 906.

Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not

3

adequately set forth the issues to be decided by the jury and may constitute reversible error. *Doyle v. Picadilly Cafeterias*, 576 So.2d 1143, 1152 (La.App. 3 Cir.1991).

Correlative to the judge's duty to charge the jury as to the law applicable in a case is a responsibility to require that the jury receives only the correct law. *Melancon v. Sunshine Construction, Inc.*, 97-1167, p. 6 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011, 1016; *Doyle*, 576 So.2d at 1152.

Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.

However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. *Nicholas v. Allstate Insurance Company*, 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023; *see also Brown v. White*, 405 So.2d 555, 560 (La.App. 4 Cir.1981), *rev'd on other grounds on reh'g*, 430 So.2d 16 (La.1983) (the question is whether the jury was misled to the extent that it was prevented from doing justice) and *Jones v. Liberty Mutual Insurance Company*, 568 So.2d 1091, 1094 (La.App. 5 Cir.1990), *writ denied*, 572 So.2d 72 (1991) (reversible error occurs here when the jury is misled to such an extent as to prevent it from doing justice).

*Id*. at 804.

Here, Plaintiffs specifically assert that the trial court erred in instructing the jury that only the direct acts or omissions of XH and XTO—and not those of the contractors to whom they delegated the performance of their contractual

obligations—could be considered in determining whether XH and XTO breached their contractual obligations.

In opposition, Defendants contend that the assignment of error mischaracterizes Plaintiffs' claims against them. According to Defendants, the claims against them at trial were direct breach of contract claims.

Plaintiffs' sixth amending petition, for example, alleges direct breach of contract claims based on XH's alleged failure "to hire a competent contract-operator to operate the Well in a good and workmanlike manner"; XTO's alleged failure "to operate and maintain the Leases of XH and diligently and carefully perform all of the work required to operate and maintain the Leases in a good and workmanlike manner in accordance with the past practices of XH and the terms of applicable operating agreements"; XTO's alleged failure to "ensure that all materials and work supplied under the Agency Agreement will be of good quality and free from defects"; XTO's alleged failure to "take all reasonable steps necessary to maintain adequate protection of persons and property during XTO's performance of services under the agreement"; XH and XTO's alleged failure to "conduct all such operations in a good and workmanlike manner"; and XH and XTO's alleged failure "to ensure that drilling mud material, including bentonite, was maintained in inventory on site at all times." And based on our review of the record, the evidence adduced by Plaintiffs at trial fell within the scope of these allegations.

As to the jury instructions, the trial court initially explained to the jury that "I will now provide you with instructions regarding plaintiff[s'] breach of contract claims." The trial court instructed the jury to consider the JOA and Agency Agreement, pointing out that "these contracts constitute the law between the parties."

5

The trial court then discussed the duties and responsibilities under the JOA, explaining:

> The 1983 Joint Operating Agreement provides that XH "shall conduct all operations in a good and workmanlike manner, but shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct." This provision should also be applied to XTO.

The trial court next instructed the jury as to the duties and responsibilities under the Agency Agreement:

> In the Agency Agreement, XTO also agreed "to diligently and carefully perform all of the work required to operate and maintain the Leases in a good and workmanlike manner in accordance with the past practices of XH and the terms of applicable operating agreements."

And finally, the trial court summarized La.Civ.Code art. 1994, stating that "[a] failure to perform a contract can result from either non-performance, defective performance or delay in performance."

Significantly, the sole instruction that Plaintiffs complain about was not given during the trial court's instructions pertaining to breach of contract. Rather, it was given during the trial court's subsequent comparative fault instructions. And as to those instructions, the trial court first explained to the jury that "the contracts between the parties require that the plaintiffs prove that the acts or omissions of the defendants rose to the level of gross negligence or willful misconduct in order to recover in this case." After that, the trial court explained:

> If you find that the acts or omissions of XH or XTO rose to the level of gross negligence or willful misconduct and that such conduct was a legal cause of the plaintiffs' loss, you must apportion fault between any person or company, whether a defendant in the matter or not, who you find to have been at fault.

Within this instruction, the trial court explained that "each party's fault must be judged based solely upon their own acts or omissions. No party in this case is

legally responsible for the acts or omissions of any other party." This is the instruction that Plaintiffs contend was erroneously given. But this instruction has nothing to do with whether Defendants breached the JOA or Agency Agreement. In addition, because the jury found that Defendants' acts or omissions did not rise to the level of gross negligence or willful misconduct, the jury never reached causation or fault apportionment on the verdict form.

In summary, we find that the instructions given to the jury, when viewed as a whole, fairly and reasonably point out the issues presented by both the pleadings and the evidence, and accurately reflect the applicable law. Thus, this assignment of error is without merit.

**Second Assignment of Error**

Here, Plaintiffs contend that the trial court erred in finding that their breach of contract claims against XTO under the Agency Agreement required a showing of gross negligence. We disagree.

Before going further, a little more background information is needed. For starters, the JOA was signed in 1983 by Placid Oil Company (now Petro-Hunt) and Louisiana-Hunt Petroleum Corporation (now XH). Three years later, Louisiana-Hunt Petroleum Corporation changed its name to Hunt Petroleum Corporation. In 2008, XTO purchased Hunt Petroleum Corporation and acquired its interests in various oil and gas fields throughout the United States. Hunt Petroleum Corporation was then renamed XH, and XTO turned XH into a holding company. Also in 2008, XTO entered into the Agency Agreement with XH permitting XTO to "manage all of the oil and gas interests held by XH."

Six years after that, XTO and Petro-Hunt agreed to drill the subject well. Then there was a blowout, this lawsuit began, and motions for summary judgment

were filed, all in that order. There are two motions that are relevant to this assignment of error. First, Plaintiffs filed a motion for partial summary judgment in August 2019. There, Plaintiffs requested judgment declaring that Petro-Hunt is a third-party beneficiary of the Agency Agreement and that the exculpatory clause of the JOA does not apply to XTO. And second, Defendants filed in response a cross-motion for summary judgment. In essence, Defendants' cross-motion sought the opposite relief.

Both motions were heard at the same time in December 2019, and summary judgment was rendered a few weeks later. The trial court granted Plaintiffs' motion, in part, ruling that Petro-Hunt was a third-party beneficiary of the Agency Agreement. This meant that Petro-Hunt could sue XTO under the Agency Agreement. But the trial court also denied Plaintiffs' motion as to the applicability of the exculpatory clause. On this issue, the trial court granted Defendants' cross-motion, specifically ruling that the exculpatory clause of the JOA applied to XTO. This meant that Plaintiffs' claims against XTO required a showing of gross negligence or willful misconduct. And this is the ruling that Plaintiffs now suggest was error.

In reviewing a trial court's decision on a motion for summary judgment, this court applies the de novo standard of review using the same criteria applied by the trial court to determine whether summary judgment is appropriate. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880. To this end, "a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3).

8

The dispositive issue here is this: Does the exculpatory clause contained in the JOA apply to XTO? And this is a matter of contract interpretation.

"Interpretation of a contract is the determination of the common intent of the parties." La.Civ.Code art. 2045. "The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed." *Prejean v. Guillory*, 10-740, pp. 6-7 (La. 7/2/10), 38 So.3d 274, 279. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-911 (La. 1/14/94), 630 So.2d 759. "[W]hen a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit[.]" *Prejean*, 38 So.3d at 279. And "when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate." *Sims v. Mulhearn Funeral Home, Inc.*, 07-54, p. 10 (La. 5/22/07), 956 So.2d 583, 590.

With this in mind, we turn our attention to the JOA and Agency Agreement. The JOA is a standard form American Association of Professional Landmen operating agreement that is commonly used in drilling operations across the country. One of the essential elements of these operating agreements is the exculpatory clause—also known as a limitation of liability clause. The exculpatory clause is found in Article V, Paragraph A, and it reads as follows: the Operator "shall conduct all such operations in a good and workmanlike manner, but it shall have no liability

9

as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct."

Article XVI of the JOA then states that it "shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, *legal representatives*, successors and assigns." (Emphasis added). So the issue is whether XTO is XH's "legal representative" for purposes of the JOA.

Louisiana courts have specifically found that the term "legal representative" includes those who have been given authority to represent another under the Louisiana Civil Code articles on representation and mandate (La.Civ.Code arts. 2985-3000). *See, e.g., Holloway v. Shelter Mut. Ins. Co.*, 03-896 (La.App. 3 Cir. 12/10/03), 861 So.2d 763, *writ denied*, 04-87 (La. 3/19/04), 869 So.2d 854. As the comments to Article 2985 make clear, "the word 'representation' is used to convey the same meaning as the word 'agency' in common-law systems." La.Civ.Code art. 2985 cmt. a.

And this brings us to the Agency Agreement between XH and XTO. Although this agreement is governed by Texas law, the result under Louisiana law is the same. The Agency Agreement expressly engages XTO "to manage all of the oil and gas interests held by XH (collectively the 'Leases') on behalf of XH." It then designates XTO as the "Operator of Leases." And as such, "XTO agrees to operate and maintain the Leases of XH and to diligently and carefully perform all of the work required to operate and maintain the Leases[.]"

Without going further, it is clear to us that XTO is XH's legal representative under the JOA. Thus, the exculpatory clause applies to XTO, meaning that Plaintiffs' breach of contract claims against XTO required a showing of gross negligence or willful misconduct.

But there is more. The Agency Agreement further provides that XTO would operate and maintain all of XH's oil and gas interests "in a good and workmanlike manner in accordance with the past practices of XH *and the terms of the applicable operating agreements*." (Emphasis added). The trial court correctly interpreted the emphasized language to include the JOA.

Indeed, after the trial court agreed with Plaintiffs at the summary judgment hearing that they were third-party beneficiaries of the Agency Agreement, the court aptly reasoned: "part and parcel of that is . . . the Agency Agreement incorporates the JOA. And all the conditions of the JOA. You can't just pick and choose. So, I do believe the exculpatory clause applies[.]" Stated differently, Plaintiffs cannot have it both ways: on the one hand, they sought to enforce the obligations of the Agency Agreement against XTO, yet on the other they attempted to avoid the JOA's exculpatory clause which the Agency Agreement incorporated.

In summary, the trial court correctly determined that the exculpatory clause in the JOA applied to XTO, meaning that Plaintiffs' breach of contract claims against XTO under the Agency Agreement required a showing of gross negligence. Plaintiffs' assignment of error is therefore without merit.

**Third Assignment of Error**

In this assignment, Plaintiffs contend that "[t]he district court's ruling that comparative fault applied to Plaintiffs' breach of contract claims, and its jury instructions reflecting same, were error."

Based on our disposition of the previous assignments—and because the jury never reached the fault apportionment section on the jury verdict form since it found that XH and XTO did not breach the agreements by gross negligence or willful misconduct—this assignment of error is moot and need not be addressed.

11

**Fourth Assignment of Error**

Plaintiffs assert in their fourth assignment that "[t]he district court's exclusion of evidence in XTO's 'root cause analysis' report regarding the cause of the blowout was error."

A few years before trial, the evidence in question was excluded pursuant to Defendants' motion in limine. Plaintiffs, in turn, filed an application for supervisory writ, making the same argument as they do now: that the trial court erred in excluding evidence in XTO's investigative report. In short order, this court ruled as follows: "**WRIT DENIED.** We find no abuse of discretion in the trial court's rulings." *Certain Underwriters at Lloyd's, London v. Alliance Drilling Consultants, L.L.C.,* 20-641, p. 1 (La.App. 3 Cir. 2/1/21) (emphasis in original).

Now on appeal, Defendants contend that our previous ruling on Plaintiffs' writ application is the law of the case. We disagree. In fact, it appears that Defendants' argument is squarely at odds with the statement of law given in *Davis v. Jazz Casino Co., L.L.C.*, 03-276, 03-1223 (La. 6/6/03), 849 So.2d 497. There, the Louisiana Supreme Court explained that

> once a court of appeal declines to exercise its supervisory jurisdiction by denying the writ, the court was without jurisdiction to affirm, reverse or modify the judgment of the trial court. *Thus, any language in the court of appeal's earlier writ denial purporting to find no error in the trial court's . . . ruling is without effect.*

*Id*. at 498 (emphasis added). For this reason, the law of the case doctrine is inapplicable to this situation.

Now back to Plaintiffs' fourth assignment of error. The essence of this assignment is that the trial court misapplied La.Code Evid. art. 407, which states:

> In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove

negligence or culpable conduct in connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility.

In *Hanover Insurance Co. v. Riceland Aviation, Inc.*, 18-892 (La.App. 3 Cir. 4/10/19), 269 So.3d 911, this court explained that the abuse of discretion standard, not de novo review, applies to the exclusion of evidence under La.Code Evid. art. 407. Thus, we must decide whether the trial court abused its discretion in excluding portions of XTO's investigative report.

Plaintiffs note that after the blowout, XTO sent an investigation team to perform a "root cause analysis" to determine the causes of the blowout. Following the investigation, the team prepared the Root Cause Analysis report, from which three sections were excluded by the trial court: the Lessons Learned section; the Action Steps section; and the Preliminary/Final Report section.

According to Plaintiffs, the first two sections identify causes of the blowout, including XTO's alleged negligent failure to institute an adequate drilling program in a highly dangerous formation. The third section, meanwhile, contains tables that identify root causes of the accident along with corrective actions that would have prevented the blowout. Plaintiffs assert that nothing in those sections was ever acted upon or implemented by XTO: no changes were made to XTO's policies and procedures following the blowout. Thus, because no subsequent remedial measures were undertaken by XTO, the trial court erred in excluding the above portions of the investigative report. This is the gist of Plaintiffs' argument.

13

In opposition, Defendants point to several cases involving similar exclusions under La.Code Evid. art. 407.[1] For example, in *Underwriters at Lloyd's, London v. OSCA, Inc.*, Nos. 03-20398, 03-20817, 03-21021 (5th Cir. 4/12/06), 2006 WL 941794 (per curiam), the portion of the root cause report that proposed new procedures, policies, and training as well as the review of old procedures, policies, and training was redacted before it was given to the jury.

Additionally, in *Chesapeake Louisiana, L.P. v. Innovative Wellsite Systems, Inc.*, No. 12-2963 (W.D. La. 1/23/15), 2015 WL 339022, at *1, evidence of a post-blowout memorandum establishing requirements for the use of barriers in wells "to further limit the chance of well control incidents" was an inadmissible subsequent remedial measure. And so too was evidence from a safety meeting regarding a presentation on operational changes and steps that should be taken to increase worker safety during future well procedures.

And finally, in *Thornton v. Diamond Offshore Drilling, Inc.*, No. 07-1839 (E.D. La. 5/19/08), 2008 WL 2315845, the court determined that portions of an incident investigation report containing recommendations were inadmissible evidence of subsequent remedial measures. The court explained: "Although recommendations are not remedial measures that have been implemented, they are of the same character in that they reflect a party's post-accident considerations and thinking about policy changes and safety improvements." *Id*. at *5. Thus, the recommendations were excluded.

---

[1] The cases cited by Defendants interpret and apply Fed.Rule Evid. art. 407. But this is of no consequence. *See, e.g., Thomas v. A.P. Green Indus., Inc.*, 05-1064, p. 36 n.20 (La.App. 4 Cir. 5/31/06), 933 So.2d 843, 867 ("Because [La.Code Evid.] art. 407 is based on the parallel federal rule of evidence, Rule 407, we find it appropriate to look to the jurisprudence construing the federal rule for guidance.").

In short, the trial court here did not abuse its discretion in excluding the disputed sections of the investigation report. This assignment of error is also without merit.

**Fifth Assignment of Error**

Plaintiffs' remaining assignments of error—assignments five through nine—address the trial court's judgment on costs. In that judgment, the trial court awarded the following costs to Defendants: $17,266.80 for depositions used at trial; $21,290.45 for clerk of court fees; $10,729.62 for copying of trial exhibits; $12,000.00 for trial presenter costs; $99,544.64 for the expert fees of Don Bazer; $109,900.57 for the expert fees of Louis Gilbert; and $235,847.11 for the expert fees of John McBeath.[2]

"The district court has great discretion in awarding costs, including expert witness fees, deposition costs, exhibit costs, and related expenses. On appeal, the district court's assessment of costs will not be disturbed absent an abuse of discretion." *Reynolds v. La. Dep't of Transp.*, 15-1304, p. 4 (La.App. 1 Cir. 4/13/16), 194 So.3d 56, 59 (citations omitted). However, if the district court's decision was based on an "erroneous interpretation or application of law rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference." *Kem Search, Inc. v. Sheffield*, 434 So.2d 1067, 1071–72 (La.1983).

In this fifth assignment, Plaintiffs assert that the trial court erred in awarding expert fees for experts who did not testify at trial. Plaintiffs further assert, in the

---

[2] To give context to the size of this case, consider this: the record on appeal consists of forty-nine volumes, totaling 12,505 pages. The jury trial lasted six days. The hearing on costs took two days. And the amount of damages being sought by Plaintiffs was in the multiple millions.

alternative, that the fee award should be reduced. While our discussion below follows this order, we must first address the applicable law.

Louisiana Code of Civil Procedure Article 1920 provides the general rule for awarding costs, stating in part that "[e]xcept as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." Expert fees are addressed by La.R.S. 13:3666, which states in part:

> A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.

> B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:

> (1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.

> (2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.

Here, two of Defendants' experts—Don Bazer and Louis Gilbert—did not testify at trial. Yet the trial court awarded them expert fees in the amounts of $99,544.64 and $109,900.57, respectively. So the initial question is this: Did the trial court abuse its discretion in awarding expert fees for these non-testifying experts? In our view, the answer is no.

After all, in *Mace v. Turner*, 18-339, p. 5 (La.App. 3 Cir. 12/6/18) (unpublished), this court explained that "compensation may be awarded to an expert

16

who does not testify at trial." Additionally, in *Roach v. State through Dep't of Transp. & Dev.*, 20-211, 20-212 (La.App. 3 Cir. 9/22/21), 329 So.3d 974, *writ denied*, 21-1527 (La. 1/12/22), 330 So.3d 621, this court found no abuse of discretion in the trial court's award of costs for non-testifying experts. And in yet another example, *Burtner v. Lafayette Parish Consolidated Government*, 14-1180, p. 12 (La.App. 3 Cir. 4/15/15), 176 So.3d 1056, 1065, *writ denied*, 15-938 (La. 6/19/15), 169 So.3d 350, this court explained that La.R.S. 13:3666 "simply allows, in the trial court's discretion, for 'additional compensation' to be awarded should [the expert] be required to testify in court." It does not, however, preclude the trial court from awarding costs incurred for experts who did not testify. *Id*.

Here, Judge Christopher Peters presided over this case for its entire seven-year duration. His costs rulings were made after a two-day contradictory hearing, during which each expert whose fees were sought testified. For instance, Bazer and Gilbert testified about their qualifications and extensive work performed in this case. And as Judge Peters put it: "All of these gentlemen were hired for [the] defense of this case. All of these gentlemen gave depositions, they prepared for depositions, they prepared for testimony and they were present in the courtroom[:] I think one (1) of them maybe two (2) days[;] the rest of them may have been four (4) or five (5) days at that point." They were "subpoenaed . . . in the courtroom ready and willing to setup for trial."

Defense counsel explained to Judge Peters that the decision for Bazer and Gilbert not to testify was made only after the cross-examination of Plaintiffs' experts: the evidence adduced during Plaintiffs' case-in-chief made Bazer and Gilbert's testimony unnecessary. And that decision streamlined the trial and avoided wasting the jury's time.

17

Judge Peters reasoned:

I didn't hear anything today—obviously [Mr. Bazer] is qualified[.] I didn't hear anything today that told me that he wasn't prepared to testify, he wasn't going to be needed and ultimately that decision was made that he wasn't going to have to testify. Again he was here, he was ready to testify, he took time and he had to prepare[.] I think that his time and efforts in regards to his activities in this case are appropriate as well. Therefore, that is awardable as costs as well. Same thing with Mr. Gilbert.

Put simply, Judge Peters awarded expert fees for Bazer and Gilbert based on his judicial experience, his observations while presiding over this litigation for seven years, and his evaluations of Bazer and Gilbert's testimony during the two-day hearing on costs.[3] The award is in line with our decisions in *Mace*, 18-339, *Roach*, 329 So.3d 974, and *Burtner*, 176 So.3d 1056. And the award is supported by a fair interpretation of the record before us. Hence, the trial court did not abuse its discretion in awarding expert fees for Bazer and Gilbert.

### *Reduction of Expert Fees*

Plaintiffs further assert that the awards to all three of Defendants' experts—Bazer, Gilbert, and John McBeath[4]—should be reduced on various grounds. Thus, Plaintiffs question the reasonableness of the awards.

The reasonableness of an expert fee award was addressed in *Bayou Fleet, Inc. v. Bollinger Shipyards, Inc.*, 15-487, 15-702 (La.App. 4 Cir. 7/21/16), 197 So.3d 797. There, the fourth circuit explained:

Although it is a case-specific determination, courts have identified multiple factors to consider in determining a reasonable expert fee award, including the following: (1) the amount of time consumed by the expert in compiling his or her report; (2) the amount charged to the client; (3) the amount of time spent in preparing for trial;

_____

[3] Bazer was a petroleum engineer, and Gilbert was a petroleum geologist. At the time of the hearing on costs, both experts had decades of experience in their respective fields.

[4] McBeath testified at trial as an expert in reservoir engineering.

(4) the amount of time spent in court; (5) the expert's expertise; (6) the difficulty of the expert's work; (7) the amount of the award; and (8) the degree to which the expert witness's opinions aided the court in its decision. A litigant is only entitled to recover as costs the expert fees incurred directly in connection with the expert's assistance at the trial. An expert may receive fees for work done in preparation for trial, but not for consultations assisting the attorney to prepare for trial.

*Id*. at 811 (citations omitted). These "reasonableness factors" were adopted by this court in *Mace*, 18-339.

Now to Plaintiffs' specific arguments for reducing the expert fees.

### A. *Time Spent Assisting Counsel in Preparation for Litigation*

Plaintiffs argue that the expert fees for telephone communications and meetings with counsel should have been excluded as time spent assisting the attorney in preparation for litigation. We disagree.

For starters, Plaintiffs repeatedly questioned all three experts at the costs hearing about their invoice entries. And all three testified that they did not include charges for assisting or educating defense counsel. In fact, when Bazer was asked if he spent time educating defense counsel, he replied: "No, we just talked back and forth about how it was going and if I needed any more information or what other information might be available." Similarly, Gilbert explained that his "communications with [counsel] were fairly limited." He added, "I can't think of much time at all that I spent actually educating [counsel]."

Likewise, McBeath testified: "I don't recall any work where I was having to educate these attorneys." Later on, McBeath reiterated this point: "I have said a few times here I don't remember trying to educate attorneys on this or in this matter." And when he was asked about assisting defense counsel in preparing for *Daubert* hearings, McBeath answered: "I only prepared myself for those hearings. I didn't help anybody else prepare anything else."

After listening to the testimony, Judge Peters concluded that this "is not a case where counsel was educated. I think we can all agree that y'all have done this over the years in multiple settings over the years so it is not a lot of education in this that has to be made for y'all. You are all experienced lawyers and you know this so I don't think that is an issue in this regard."

In short, the trial court did not abuse its discretion in declining to reduce the expert fee awards on this basis.

### B.    Depositions and Expert Reports

Plaintiffs next seek to exclude fees for each expert's deposition, preparation, and expert report. This argument also lacks merit.

As noted in *Bayou Fleet*, 197 So.3d 797, and *Mace*, 18-339, the amount of time consumed by an expert in compiling his report is a specific factor that courts consider in determining a reasonable expert fee award.

Further, as explained in *Butler v. Louisiana Mutual Medical Insurance Co.*, 15-1191, p. 10 (La.App. 4 Cir. 5/25/16), 195 So.3d 570, 577, *writ denied*, 16-1206 (La. 10/10/16), 202 So.3d 169, the fees related to expert depositions that were not introduced at trial falls "within the trial court's discretion to tax" as court costs. Notably, the trial judge in *Butler* was an "'active' participant from 'day one' and 'vividly' recalled the trial[,]" and he found that the deposition costs were necessary to bring the case to trial. *Id*. at 578.

Like the trial judge in *Butler*, Judge Peters was clearly an active participant from day one and vividly recalled the trial. And Judge Peters found that "from the testimony indicated and from looking at the invoices, everything that is being claimed appears to be things that had to be taken care of in preparation for defending this lawsuit."

20

In sum, we find that the trial court did not abuse its discretion in awarding fees for each expert's deposition, preparation, and expert report.

### C. Travel Expenses

Plaintiffs assert that the fees and charges related to McBeath's travel expenses from Texas to Louisiana should be excluded. However, the record shows that these travel expenses were not included in Defendants' request for costs. In short, the trial court did not include any improper travel expenses in its fee award for McBeath.

Plaintiffs also assert that the fees and charges for Gilbert's travel from Texas to Louisiana for his deposition and trial attendance should be excluded. Yet the record shows that Gilbert did not travel from Texas to Louisiana; he was not an out-of-state witness. Rather, he was an in-state witness who is entitled to travel expenses under La.R.S. 13:3661. And so too here, the trial court did not include any improper travel expenses in its fee award for Gilbert.

### D. Daubert Motion

Plaintiffs next argue that the trial court abused its discretion by failing to remove McBeath's fees related to Petro-Hunt's *Daubert* motion: the motion was rendered moot by stipulation of the parties.

In rejecting Plaintiffs' argument, the trial court explained:

I don't believe that there is any way that you can hold your mouth right and say that Mr. McBeath should not be compensated in regards to his Daubert hearing[.] [T]he man had to be here and he was required to be here. Because y'all decided that y'all didn't need to and reached a resolution between the multiple parties at that point it doesn't mean that he didn't have to prepare and it doesn't mean that he didn't have to be here. So those costs that are associated with that are well within [the] discretion of this Court and well within the reason of being able to be compensated and be awarded as fees.

Once again, the trial court did not abuse its discretion in declining to reduce the expert fee on this basis.

**Sixth and Ninth Assignments of Error**

In these two assignments, Plaintiffs contend that the costs for the depositions of Justin Reeves, Clay Kimbrell, Judd Hansen, and Scott Peacock should be excluded because those depositions—even though used at trial for impeachment purposes—were not admitted into evidence. We disagree.

In relevant part, La.R.S. 13:4533 states that the "costs of taking depositions . . . used on the trial . . . shall be taxed as costs." The plain language of the statute does not exclude depositions that were used on the trial for impeachment purposes.

In addition, this court addressed and rejected the same argument in *Mace*, 18-339. In that case, the argument ran as follows:

> Mace insists that she should not be required to pay the $270.00 Defendants incurred in taking her deposition because she testified live at trial and her deposition was not admitted into evidence. Defendants submit that because it used portions of Mace's deposition for impeachment purposes during her cross examination, such cost was recoverable under La.R.S. 13:4533.

*Id*. at 7. The trial court in *Mace* included the deposition cost, and the inclusion of that expense was affirmed on appeal.

In our case, Judge Peters "remember[ed] specifically multiple witnesses that we had that were being impeached. While we may not have put the depositions into evidence[,] I know that memories were refreshed by using the depositions and they were used."

Put simply, the trial court did not abuse its discretion in including these deposition costs in its fee award.

**Seventh Assignment of Error**

Here, Plaintiffs argue that "[t]he district court abused its discretion in awarding 100% expert fees where Defendants failed to prove XH and XTO paid the fees." We disagree.

In essence, Plaintiffs argue that the fee award should be reduced because the experts' invoices were sometimes paid by Exxon-Mobil—Defendants' parent company—rather than directly by Defendants. Although the issue of corporate separateness may have been relevant in some aspects of this litigation, it is of no moment regarding how wholly owned subsidiaries and their parent companies handle the payment of litigation costs.

Judge Peters recognized that any bills paid by Exxon-Mobil were paid on behalf of XH and XTO. Judge Peters then awarded the fees to Defendants as the prevailing parties in this litigation. We cannot say that the trial court abused its discretion in this respect. Hence, this assignment is also without merit.

**Eighth Assignment of Error**

Plaintiffs assert in this assignment that "[t]he district court abused its discretion in awarding 100% expert fees where experts were shared by Settling Defendants, and unrelated cases, and XH and XTO failed to prove the amount of their portion of the expert fees billed."

Plaintiffs note that they originally filed suit against three groups of defendants: XTO and XH; Alliance and Pritchard; and D&D. Plaintiffs also note that experts Gilbert and McBeath were retained by all three defendant-groups, and that these experts performed work for the three groups at least until Alliance, Pritchard, and D&D settled with Plaintiffs. Plaintiffs point out that neither expert was able to

itemize the expenses that should have been charged to each defendant-group. Nor were they able to identify which group had paid their fees.

In addition, Plaintiffs note that Bazer was retained by XH and XTO in two different cases arising from the blowout: this case and a case identified as *State Farm v. D&D Drilling*. Plaintiffs explain that both cases are referenced in Bazer's invoices, that they were never a party in *State Farm v. D&D Drilling*, and that Bazer's invoices failed to delineate the work that was done in each case. Plaintiffs thus seek a reduction in the fee award.

In opposition, Defendants note that all three experts testified that the work they performed would have been the same no matter the number of defendants or other cases. McBeath, for example, testified as follows:

> Q. Whether that cost was divided between one (1) party, two (2) parties, three (3) parties or a hundred parties would it be the same amount of work?
>
> A. It is, yeah that is right.
>
> Q. So if you would have been hired solely by XTO to do what you did[,] it would have been the same amount of work, correct?
>
> A. The gross amount would have been the same that is right, yeah.

Similarly, Gilbert agreed that whether the cost was split between one, three, or fifty, it was the same work and "it wouldn't have made any difference at all." And Bazer's testimony was no different.

In the end, Judge Peters recognized "the testimony from all three (3) gentlemen that told me that we didn't do this solely for Alliance, we didn't do this solely for D&D and we didn't do this solely for XTO/XH until we got to trial and then that was all XTO and XH." Judge Peters found that "from the beginning that

24

work was going to have to be done anyway." He then awarded XTO and XH their full fees.

All in all, the trial court did not abuse its discretion in declining to reduce the fee award on this basis. This assignment of error is also without merit.

## DECREE

We affirm the trial court judgments of June 1, 2022, and February 1, 2023. And the costs of this appeal are assessed to Plaintiffs, Petro-Hunt LLC and Certain Underwriters at Lloyd's, London.

**AFFIRMED.**